# EXHIBIT 1

1  **ROME & ASSOCIATES, A.P.C.**
   Eugene Rome (SBN 232780)
2  Bradley O. Cebeci (SBN 198163)
   Sridavi Ganesan (SBN 216129)
3  2029 Century Park East, Suite 450
   Los Angeles, California 90067
4  Telephone: (310) 282-0690
   Facsimile: (310) 282-0691
5

PER LOCAL RULE, THIS
CASE IS ASSIGNED TO
DEPT. 12 – FOR ALL
PURPOSES

SUMMONS ISSUED

F I L E D

OCT 28 2019

CLERK OF THE COURT
SUPERIOR COURT OF CALIFORNIA
COUNTY OF CONTRA COSTA

6  Attorneys for Plaintiff
   MM DEVELOPMENT COMPANY, INC. d/b/a PLANET 13
7

8  **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9  **COUNTY OF CONTRA COSTA**

10

| | |
|---|---|
| 11  MM DEVELOPMENT COMPANY, INC., a Nevada corporation doing business as PLANET 13,<br><br>13         Plaintiff,<br><br>14         v.<br><br>15  LINX CARD, INC., a Delaware corporation; LINXPAY, INC., a California corporation; LPH FINANCIAL, INC., a California corporation; LPH HOLDINGS, INC., a corporation of unknown origin; GIVV, INC., a California corporation; GiVV Technologies Ltd., an Australian limited liability entity; OLD DOMINION HOLDINGS, INC., a suspended California corporation; FIRST DATA MERCHANT SERVICES LLC, a Florida limited liability company; PATRICK HAMMOND, an individual; KEVIN SENN, an individual; JOSHUA SENN, an individual; ZACH SENN, an individual; PELICAN COMMUNICATIONS, INC., a California corporation; RICHARD J. SCHERER, an individual; and DOES 1 through 25, inclusive,<br><br>24         Defendants. | Case No. C19-02272<br><br>**COMPLAINT FOR:**<br><br>**(1) FRAUD**<br><br>**(2) BREACH OF CONTRACT**<br><br>**(3) DECEIT**<br><br>**(4) CONVERSION**<br><br>**(5) VIOLATION OF PENAL CODE SECTION 496**<br><br>**(6) UNFAIR COMPETITION IN VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200 *et seq.***<br><br>**(7) NEGLIGENCE**<br><br>**DEMAND FOR JURY TRIAL** |

25

26

27

28

COMPLAINT

1   Plaintiff MM DEVELOPMENT COMPANY, INC. *doing business as* PLANET 13 alleges

2 against Defendants LINX CARD, INC., LINXPAY, INC., LPH FINANCIAL, INC., GIVV, INC.,

3 GIVV TECHNOLOGIES LTD.; LPH HOLDINGS, INC., OLD DOMINION HOLDINGS, INC.,

4 FIRST DATA MERCHANT SERVICES LLC, PATRICK HAMMOND, KEVIN SENN, JOSH

5 SENN, ZACH SENN, PELICAN COMMUNICATIONS, INC., RICHARD J. SCHERER, and

6 DOES 1-25 (collectively, "Defendants"), as follows:

7           **PARTIES**

8   1.  Plaintiff MM DEVELOPMENT COMPANY, INC. ("Plaintiff") is, and at all times

9 relevant was, a Nevada corporation doing business under the registered fictitious business name

10 PLANET 13, with its principal place of business in Henderson, Nevada.

11   2.  Defendant LINX CARD, INC. ("Linx Card") is, and at all times relevant was, a

12 Delaware corporation, qualified to do business in California, with its principal place of business in

13 Walnut Creek, California.

14   3.  Defendant LINXPAY, INC. ("LinxPay") is, and at all times relevant was, a

15 California corporation with its principal place of business in Walnut Creek, California.

16   4.  Defendant LPH FINANCIAL, INC. ("LPH Financial") is, and at all times relevant

17 was, a California corporation with its principal place of business in Walnut Creek, California.

18   5.  Defendant LPH HOLDINGS, INC. ("LPH Holdings") is, and at all times relevant

19 was, a corporation of unknown origin, with its principal place of business in Walnut Creek,

20 California.

21   6.  Defendant GIVV, INC. ("GIVV") is, and at all times relevant was, a California

22 corporation, with its principal place of business in Walnut Creek, California.

23   7.  Defendant FIRST DATA MERCHANT SERVICES LLC ("First Data") is, and at all

24 times relevant was, a Florida limited liability company with is principal place of business in Atlanta,

25 Georgia.

26   8.  GiVV Technologies Ltd. ("GIVV LTD.") is, and at all times relevant was an

27 Australian limited liability entity.

28

9.     Old Dominion Holdings, Inc. ("Old Dominion") is, and at all times relevant was, a California corporation whose status is presently listed as FTB Suspended.

10.     Defendants Linx Card, LinxPay, LPH Financial, GIVV and LPH Holdings are hereinafter referred to collectively as the "LINX Entities."

11.     Defendant PATRICK HAMMOND ("Hammond") is, and at all times relevant was, an individual residing in Walnut Creek, California, and is a co-founder, owner, officer and director of each of the LINX Entities.

12.     Defendant KEVIN SENN ("Senn") is, and at all times relevant was, an individual residing in Walnut Creek, California, and is a co-founder and owner of each of the LINX entities. Senn also happens to be a disbarred California attorney, whose disbarment incidentally stemmed from misappropriation of client funds. (http://members.calbar.ca.gov/fal/Licensee/Detail/136226).

13.     Defendant ZACH SENN ("Z. Senn") is, and at all times relevant was, an individual residing in Walnut Creek, California.

14.     Defendant JOSH SENN ("J. Senn") is, and at all times relevant was, an individual residing in Walnut Creek, California, and is a co-owner of each of the LINX entities.

15.     The LINX Entities, Hammond, Z. Senn, J. Senn and Senn are hereinafter referred to collectively as the LINX Defendants.

16.     Defendant PELICAN COMMUNICATIONS, INC. ("Pelican") is, and at all times relevant was, a California corporation with its principal place of business in Danville, California.

17.     Defendant RICHARD J. SCHERER ("Scherer") is, and at all times relevant was, an individual residing in Walnut Creek, California, and is a president of Pelican.

18.     Plaintiff alleges that each of the LINX Entities are alter egos of Defendants Hammond, J. Senn and Senn. Further, Old Dominion is an alter ego of Senn. Additionally, GIVV LTD. is an alter ego of LINX. At all times mentioned herein, there existed a unity of interest in ownership between each of the LINX Entities, on the one hand, and Defendants Hammond, J. Senn and Senn, on the other hand, such that the individuality and separateness between them ceased and each of the LINX Entities is the alter ego of Defendants Hammond, J. Senn and Senn in that, among

other things: (a) Defendants Hammond, J. Senn and Senn controlled, dominated, managed and operated each of the LINX Entities as their alter egos; (b) Defendants Hammond, J. Senn and Senn made all material decisions pertaining to each of the LINX Entities; (c) there has been a failure to comply with or observe the formalities of corporate formation and/or operation of each of the LINX Entities; (d) each of the LINX Entities was inadequately capitalized to carry out its intended business and pay its debts and obligations as they fell due; and (e) the individuality of each of the LINX Entities is a total sham and fiction such that upholding its corporate nature and allowing Defendants Hammond, J. Senn and Senn to escape personal liability for any entity debts would sanction a fraud or promote an injustice and should therefore be disregarded pursuant to the doctrine of piercing the corporate veil.  Indeed, at his judgment debtor examination, Senn testified that he used his personal company, Old Dominion, to serve as a de facto revolving credit provider to Linx, offering short term loans to Linx for a week or so with no written agreements in place.  Further, both Senn and Hammond acknowledged that Linx did not keep regular meetings or otherwise comply with requisite formalities.  Accordingly, Linx is little more than a corporate shell of which all of its shareholders are alter egos.

19.     Among other things, Defendants Hammond, J. Senn and Senn treated each of the LINX Entities interchangeably, using Linx Card to contract with merchants and referral agents, but then processing the associated transactions through a merchant account with First Data Merchant Services LLC ("First Data") held in the name of GIVV dba GIVV KIOSK GIFT CARDS, and using LPH Financial to effect payment of the resulting settlement proceeds to merchants and referral fees to agents, and commingling such funds between the various LINX Entities.

20.     The true names and capacities, whether individual, plural, corporate, partnership, associate, or otherwise, of DOES 1 through 25, inclusive, is unknown to Plaintiff who therefore sues said defendants by such fictitious names. The full extent of the facts linking such fictitiously sued defendants is unknown to Plaintiff. Plaintiff is informed and believes, and thereupon alleges, that each of the defendants designated herein as a DOE was, and is, negligent, or in some other actionable manner, responsible for the events and happenings hereinafter referred to, and thereby negligently,

1 | or in some other actionable manner, legally and proximately caused the hereinafter described
2 | injuries and damages to Plaintiff. Plaintiff will hereafter seek leave of the Court to amend this
3 | Complaint to show the DOE defendants' true names and capacities after the same have been
4 | ascertained.

5 |      21.    Plaintiff is further informed and believes, and thereon alleges, that Defendants,
6 | including DOES 1 through 25, inclusive, were agents, aiders and abettors, conspirators and co-
7 | conspirators, servants, employees, successors in interest, and/or joint venturers of their co-
8 | defendants, and were, as such, acting within the course, scope, and authority of said agency,
9 | employment and/or venture, and that each and every defendant, as aforesaid, when acting as a
10 | principal, was negligent in the selection of each and every other defendant as an agent, servant,
11 | employee, successor in interest, and/or joint venturer. Plaintiff is informed and believes and thereon
12 | alleges that each of the defendants designated herein as DOE aided and abetted, conspired with,
13 | and/or took part in and participated with each Defendant in all matters referred to herein, and was
14 | in some manner responsible for the injuries and losses suffered by Plaintiff.

15 | **VENUE AND JURISDICTION**

16 |      22.    Plaintiff is informed and believes and based thereon alleges that venue is proper in
17 | Contra Costa County pursuant to Code of Civil Procedure Sections 395 and 410.10 because the
18 | LINX Defendants reside and do business in Contra Costa County, California, and a substantial part
19 | of the acts, events and omissions underlying this dispute took place within Contra Costa County,
20 | California.

21 |      23.    Plaintiff is informed and believes and based thereon alleges that this Court has
22 | jurisdiction over the subject matter of this lawsuit because the amount in controversy, exclusive of
23 | interest and costs, exceeds the $25,000 minimum jurisdictional limit of the Court. Moreover,
24 | Defendants have purposely availed themselves of, and have substantial contacts with, the forum by
25 | virtue of qualifying Linx Card to do business in California, organizing LinxPay and LPH Financial
26 | in California, marketing to California businesses, entering contracts in California, and doing
27 | substantial business with California businesses, including but not limited to businesses located
28 |

within Contra Costa County, California. In addition, each of the individual Defendants communicated with Plaintiff regarding these matters, and made the false and misleading representations upon which Plaintiff reasonably and justifiably relied, from the principal business offices of each of the LINX Entities here in Contra Costa County, California.

## GENERAL ALLEGATIONS

24.     Plaintiff operates a lawful marijuana dispensary in Las Vegas, Nevada.

25.     Because of restrictions under federal law, marijuana retailers like Planet 13 have generally operated on a cash-only basis. However, Linx Card markets a solution to marijuana retailers (each a "merchant") whereby consumers can use their credit card to buy a gift card at an in-store kiosk, and then purchase marijuana products using the gift card, thereby obviating the need for the consumer to complete the transaction in cash (the "Linx Solution").

26.     From August 2018 to June 2019, Plaintiff used the Linx Solution for in-store customer purchases of its products pursuant to a written contract with Linx Card. Pursuant to that contract, Linx Card caused the net proceeds of Plaintiff's customer purchase transactions (known as settlement funds) to be deposited to Plaintiff's bank account twice per week (Wednesdays and Fridays) in the normal course of business.

27.     Beginning on or about April 26, 2019, however, Plaintiff failed to receive a series of scheduled deposits of settlement funds. Linx Card's failure to satisfy its payment obligations led Plaintiff to terminate its processing relationship with Linx Card.

28.     As of June 21, 2019, Linx Card owed Plaintiff a remaining balance of $900,506.82 (the "Outstanding Balance").

29.     Throughout this period of time, Senn acted as Linx Card's primary point of contact with Plaintiff regarding Linx Card's continuing failure to meet its payment obligations to Plaintiff. Defendants are very secretive about the mechanics of the Linx Solution, and have treated the details of the Linx Solution as confidential, proprietary and/or trade secret information, refusing even to disclose the identity of the acquiring bank and processor to Linx Card's merchant customers, or to describe the role of the various LINX Entities with respect to the Linx Solution.

30.     While refusing to provide details, however, Senn repeatedly represented to Plaintiff that the delay in payment was attributable to issues with "Linx Card's merchant account" with First Data. Senn repeatedly represented in telephone calls and emails to Plaintiff and its representatives, including Plaintiff's general counsel, Leighton Koehler, that First Data was holding the Outstanding Balance of Plaintiff's settlement funds in suspense along with the settlement proceeds of all of Linx Card's other merchants, and that Linx Card would fulfill its payment obligations to Plaintiff as soon as First Data released these funds from "Linx Card's merchant account."

31.     On June 20, 2019, Plaintiff's lawyer, Eugene Rome ("Rome"), wrote to Senn to demand that Linx Card provide Plaintiff with proof of its ability to pay, and identify the processor and acquirer used by Linx Card to process Plaintiff's transactions. Over the next three weeks, Rome communicated repeatedly with Senn and Linx Card's attorneys to negotiate an agreement between the parties to avoid the necessity of a lawsuit. During these communications, Senn continued to refer to "Linx Card's merchant account," and knowingly and intentionally led Rome to believe that First Data was holding the Outstanding Balance of Plaintiff's settlement funds in a merchant account held in Linx Card's name.   Sanjiv Dhawan, another one of Linx's directors, made the same representations to Mr. Rome.

32.     Thereafter, on or about July 12, 2019, Linx Card entered into a written agreement with Plaintiff (the "Settlement Agreement") whereby Linx Card acknowledged its obligation to pay Plaintiff the Outstanding Balance, and agreed to pay Plaintiff the Outstanding Balance, plus $18,503.56 in interest, plus $20,000 in attorneys' fees, for a total of $939,010.38 (the "Settlement Sum") by no later than August 15, 2019 in order to avoid a lawsuit. A true and correct copy of the Settlement Agreement is attached hereto as **Exhibit A** and incorporated herein by this reference as though set forth in full.

33.     Pursuant to the Settlement Agreement, Linx Card agreed to identify its merchant account at First Data, and the contact information for the First Data representative(s) primarily handling the relationship, to Plaintiff within 5 business days of signing the Settlement Agreement. This did not occur due to the fact, as subsequently discovered by Plaintiff, providing the information

1  would have disclosed the fraud perpetrated by Defendants in connection with the subject Settlement
2  Agreement.

3      34.    The Settlement Agreement also provides that, in the event enforcement of the
4  Agreement is required, Linx Card shall further be liable for all costs and expenses, including,
5  without limitation, reasonable attorneys' fees, costs and disbursements (collectively "Attorney
6  Fees") expended or incurred by Plaintiff in any way in interpreting, restructuring, collecting, or
7  otherwise enforcing the Agreement or Plaintiff's rights thereunder, whether or not a legal
8  proceeding is filed. The Settlement Agreement further provides that Attorneys' Fees shall include,
9  without limitation, attorney fees and costs incurred in any state, federal or federal bankruptcy court
10 and in any insolvency proceeding, mediation, or arbitration of any kind in any way related to the
11 Agreement.

12     35.    Pursuant to the Settlement Agreement, Linx Card also executed a Confession of
13 Judgment, authorizing judgment against Linx Card in the amount of the Settlement Sum in the event
14 Linx Card failed to pay the Settlement Sum to Plaintiff by August 15, 2019; and a Security
15 Agreement granting Plaintiff a first priority perfected security interest in all of Linx Card's assets
16 in the amount of the Settlement Sum. As reflected in the description of the Collateral contained in
17 the Security Agreement, Linx Card granted Plaintiff "a security interest to $920,506.82 plus interest
18 presently maintained by First Data Merchant Services LLC, First Data Merchant Corporation, any
19 other First Data entity and any acquirer associated with First Data." A true and correct copy of the
20 Confession of Judgment and Security Agreement is attached hereto as **Exhibits B** and **C**
21 respectively, and incorporated herein by this reference as though set forth in full.

22     36.    Pursuant to the Security Agreement, Linx Card represented and warranted that it "is
23 and will be the sole owner of the Collateral."

24     37.    Hammond signed the Settlement Agreement, Confession of Judgment and Security
25 Agreement on behalf of Linx Card, attesting to his corporate authority, and his personal knowledge
26 of the facts precipitating said agreements.

27     38.    Linx Card failed to pay the Settlement Sum to Plaintiff by August 15, 2019.

28

39.     On or about August 8, 2019, in anticipation of this eventuality, Plaintiff's attorneys emailed First Data's legal department to notify First Data of Plaintiff's security interest in Linx Card's assets, specifically including all funds maintained by First Data (up to the amount of the Settlement Sum) on behalf of Linx Card. Plaintiff's attorneys provided First Data with copies of the Settlement Agreement and Security Agreement as attachments to that email. Plaintiff advised First Data of its duty to refrain from dispersing the secured funds to any party other than Plaintiff unless and until First Data received confirmation that Linx Card had completed its payment obligations to Plaintiff.

40.     Despite following up with First Data's outside counsel, Plaintiff received no response from First Data.

41.     On or about August 16, 2019, Plaintiff filed suit against Linx Card in the District Court of Clark County, Nevada (case no. A-19-800347-C) to enforce the Confession of Judgment executed by Linx Card as part of the Settlement Agreement.

42.     On or about August 28, 2019, at approximately 1 pm PST, Plaintiff's attorney, Eugene Rome had a telephone call with First Data's in-house counsel, Christopher Demetriades, wherein Mr. Demetriades confirmed that First Data was holding a "very substantial" amount of money for "Linx."

43.     That same day, on or about August 28, 2019, the Court entered an Order allowing immediate enforcement of the judgment, and requiring First Data to immediately provide Plaintiff with the Collateral (as described in the Security Agreement) until such time as the total judgment against Linx Card in the amount of $949,559.80 (the "Judgment Amount") is satisfied in its entirety (the "Order"). A true and correct copy of the Order is attached hereto as **Exhibit D** and incorporated herein by this reference as though set forth in full.

44.     On or about August 30, 2019, the Court issued a Notice of Entry of Order, giving notice of its Order. A true and correct copy of the Notice of Entry of Order is attached hereto as **Exhibit E** and incorporated herein by this reference as though set forth in full.

45.     On or about August 30, 2019, Plaintiff's attorneys emailed First Data's in-house

1    counsel, Christopher Demetriades, to provide First Data with a copy of the Notice of Entry of Order

2    and Order. Plaintiff's attorneys requested that First Data acknowledge receipt and confirm its

3    intention to comply.

4        46.    Plaintiff received no response.

5        47.    Thus, on or about September 4, 2019, Plaintiff's attorneys emailed Mr. Demetriades

6    again to reiterate Plaintiff's request that First Data acknowledge receipt of the Notice of Entry of

7    Order and Order and confirm its intention to comply.

8        48.    On or about September 5, 2019, Plaintiffs' attorneys received an email from First

9    Data's outside attorneys, Polsinelli, protesting that First Data is not a party to the Security

10   Agreement or a party to the Nevada action, and denying that First Data has ever held "a merchant

11   account in the legal name of Linx Card, Inc." A true and correct copy of that email is attached as

12   **Exhibit F** hereto.

13       49.    Based on this email, Mr. Rome's earlier conversation with Mr. Demetriades, and

14   subsequent subpoenas to First Data, Plaintiff is informed and believes and based thereon alleges that

15   Linx Card submitted credit card transactions for the purchase of gift cards flowing from the Linx

16   Solution through a merchant account at First Data held in the name of GIVV. This was never

17   disclosed to Plaintiff prior to its receipt of the subpoena response.

18       50.    Plaintiff is further informed and believes that this merchant account was terminated

19   by First Data on or about February 2019 on the basis that the sponsor bank did not approve the

20   business, and that Linx Card thereafter assisted Pelican in the opening of a merchant account for

21   processing with First Data, and used Pelican's account to submit credit card transactions for the

22   purchase of gift flowing from the Linx Solution. Plaintiff is informed and believes that First Data

23   shortly thereafter became aware of the Linx Solution's connection to Pelican, terminated its

24   relationship with Pelican, and withheld the funds therein from being released to Pelican.

25       51.    At all relevant times during the negotiation, drafting and execution of the Settlement

26   Agreement, Confession of Judgment and Security Agreement, Senn and Hammond knew that Linx

27   Card did not have any merchant account at First Data or hold title to Plaintiff's settlement funds

28

1  being held by First Data, and that Linx Card's representation and warranty regarding its ownership

2  of the Collateral described in the Security Agreement was false.

3    52.    At all relevant times during the negotiation, drafting and execution of the Settlement

4  Agreement, Confession of Judgment and Security Agreement, Senn and Hammond knew that Linx

5  Card had caused Plaintiff's transactions to be processed through a merchant account at First Data

6  held in the name of GIVV and Pelican or some other entity that is a Linx Entity or is associated with

7  the Linx Entities but is not Linx Card.

8    53.    At all relevant times during the negotiation, drafting and execution of the Settlement

9  Agreement, Confession of Judgment and Security Agreement, Senn and Hammond knew that

10  Plaintiff was justifiably relying on its understanding that Linx Card had processed Plaintiff's

11  transactions through a merchant account held in Linx Card's name, and that Linx Card held title to

12  Plaintiff's settlement funds being held by First Data, in deciding to forego immediate litigation and

13  enter into the Settlement Agreement and Security Agreement with Linx Card, and refrain from

14  insisting that the true account-holder or any of the other LINX Entities also be a party to the Security

15  Agreement.

16    54.    On October 17, 2019, Plaintiff's counsel conducted a judgment debtor examination

17  of Linx Card's principals, Hammond and Senn. Both provided extensive details regarding Pelican's

18  involvement in the processing of Plaintiff's transactions. The salient parts of the testimony make it

19  apparent that Hammond and Senn agreed with their old golfing partner, Richard Scherer of Pelican

20  to "launder" Plaintiff's transactions through Pelican's active account at First Data.

21    55.    Specifically, after GIVV's account with First Data was terminated, rather than

22  inform Plaintiff of this fact, Defendants basically decided to submit Plaintiff's transactions for

23  processing to First Data through an entirely unrelated "service agreement" Hammond and Senn

24  worked out with Scherer in exchange for a percentage of the transactions processed. Again, at no

25  point in time was Plaintiff apprised of this activity. In aid of this scheme, Scherer, a willing

26  participant, went as far as executing a personal guarantee for Pelican's activity at First Data. A true

27  and correct copy of the subject Personal Guarantee is attached as **Exhibit G** hereto and incorporated

28

1   by reference.

2       56.     This conduct violates numerous Card Brand Rules (*see, e.g.,* Visa Core Rules

3   1.10.1.3; 10.3.1.1; and 10.11.2.5; MasterCard Rules 5.12 and 7.8.2; *see also* MasterCard Rule 7.1,

4   describing Merchant Monitoring Program Service: "Detection of Transaction laundering and the

5   monitoring of related activity whereby a Merchant or Submerchant processes Transactions on behalf

6   of another Merchant or Submerchant with whom the Acquirer or the Acquirer's Payment Facilitator

7   does not have a Merchant Agreement or Submerchant Agreement. Transaction laundering is also

8   referred to as factoring or Transaction aggregation.")

9       57.     Defendants' conduct is not merely a violation of Visa and MasterCard Rules but,

10  also, a violation of Federal banking statutes.  In effect, Defendants duped First Data by submitting

11  transactions of Plaintiff that should have gone through GIVV as transaction belonging to Pelican,

12  an entity with whom Plaintiff had ***never*** had a relationship.  These actions violate a host of U.S.

13  Federal laws and regulations, including the Federal Trade Commission Act and the Telemarketing

14  Sales Rule. The Department of Treasury's Financial Crimes Enforcement Network ("FinCEN")

15  regards such factoring activities as a variation on money laundering. Depending on the particular

16  facts, such conduct may variously violate 18 U.S.C. § 1029 (factoring), 18 U.S.C. § 371 or

17  § 1029(b)(2) (conspiracy), 18 U.S.C. § 1343 (wire fraud), or 18 U.S.C. § 1344 (bank fraud).

18  Maximum penalties range from 10-to-30-years, plus up to $1,000,000, per offense.

19                    **FIRST CAUSE OF ACTION**

20                           **FRAUD**

21                  (By Plaintiff Against LINX Defendants)

22      58.     Plaintiff restates and hereby incorporates the allegations contained in each of the

23  foregoing Paragraphs of this Complaint as though set forth in full.

24      59.     Between May and July 2019, Senn made repeated representations to Plaintiff and its

25  representatives, including Koehler and Rome, that Linx Card had failed to pay the Outstanding

26  Balance to Plaintiff because First Data had suspended all funds in Linx Card's merchant account,

27  including Plaintiff's settlement funds, and that First Data was holding Plaintiff's settlement funds

28

1   in suspense. Furthermore, Hammond represented and warranted Linx Card's ownership of the

2   Collateral described in the Security Agreement, specifically including the "$920,506.82 plus interest

3   presently maintained by First Data Merchant Services LLC, First Data Merchant Corporation, any

4   other First Data entity and any acquirer associated with First Data."

5       60.    These representations were false, and Senn and Hammond made these

6   representations knowing that they were false, because Senn and Hammond knew that Linx Card did

7   not hold title to Plaintiff's settlement funds being held by First Data, did not hold any merchant

8   account at First Data, and that Linx Card had caused all of Plaintiff's transactions to be processed

9   through a merchant account held in the name of GIVV and Pelican. Moreover, Senn and Hammond

10  knew that the true facts regarding the ownership of the merchant account used by Linx Card to

11  process Plaintiff's transactions were known and accessible only to Defendants, and that LINX

12  Defendants' failure to qualify the facts disclosed in their earlier representations about First Data

13  holding Plaintiff's settlement funds were likely to mislead Plaintiff regarding Linx Card's ownership

14  of the merchant account.

15      61.    LINX Defendants intended to deceive Plaintiff regarding these matters and induce

16  Plaintiff's reliance on these representations in order to trick Plaintiff into foregoing immediate

17  litigation against all of the LINX Entities and Pelican, and signing the Settlement Agreement and

18  Security Agreement, to gain more time and avoid LINX Defendants' immediate payment obligation

19  to Plaintiff.

20      62.    Plaintiff reasonably and justifiably relied on Senn, Hammond and Linx Card's

21  representations in deciding to forego immediate litigation against the LINX Entities and enter into

22  the Settlement Agreement and Security Agreement.

23      63.    Plaintiff has suffered monetary damages in an amount to be proven at trial as a direct

24  and proximate result of LINX Defendants' fraud.

25      64.    Plaintiff's reliance on Senn, Hammond and Linx Card's representations was a

26  substantial factor in Plaintiff's harm because, but for those representations, Plaintiff would never

27  have entered into the Settlement Agreement and/or Security Agreement, would have insisted on the

28

1 | true owner of the merchant account through which Linx Card caused Plaintiff's transactions to be

2 | processed being a party to the Security Agreement, and/or would have immediately filed suit against

3 | each of the LINX Entities and Pelican.

4 | 65. LINX Defendants' wrongful acts as described herein were intentional, malicious,

5 | oppressive and fraudulent, and were committed with reckless disregard of harm to Plaintiff, in

6 | willful and conscious disregard of Plaintiff's rights, such that Plaintiff is entitled to recover punitive

7 | and exemplary damages against LINX Defendants in an amount that is sufficient and appropriate to

8 | punish LINX Defendants, as well as to deter them from committing similar acts in the future.

9 | **SECOND CAUSE OF ACTION**

10 | **BREACH OF CONTRACT**

11 | (By Plaintiff Against All Defendants other than First Data)

12 | 66. Plaintiff restates and hereby incorporates the allegations contained in each of the

13 | foregoing Paragraphs of this Complaint as though set forth in full.

14 | 67. On or about July 12, 2019, Plaintiff entered into the Settlement Agreement with Linx

15 | Card.

16 | 68. The Settlement Agreement obligates Linx Card to pay the Settlement Sum by no later

17 | than August 15, 2019, and provides that time is of the essence. The Settlement Agreement obligates

18 | Linx Card to identify its merchant account at First Data, and the contact information for the First

19 | Data representative(s) primarily handling the relationship, to Plaintiff within 5 business days of

20 | signing the Settlement Agreement.

21 | 69. Linx Card breached its obligations to Plaintiff by failing to pay Plaintiff the

22 | Settlement Sum on or before August 15, 2019, or at all. Linx Card also breached its obligations to

23 | Plaintiff by failing to identify its merchant account at First Data within 5 business days of signing

24 | the Settlement Agreement—Linx Card owns no such merchant account.

25 | 70. Plaintiff has performed all obligations owed to Linx Card in connection with the

26 | Settlement Agreement, except for such obligations that Plaintiff has been excused or prevented from

27 | performing by virtue of Linx Card's conduct.

28 |

71.     As Plaintiff discovered, Linx Card is an alter ego of each of the other LINX Entities, which, in turn, are alter egos of Defendants Linx Ltd., Hammond, J. Senn and Senn. At all times mentioned herein, there existed a unity of interest in ownership between each of the LINX Entities, on the one hand, and Defendants Linx Ltd., Hammond, J. Senn and Senn, on the other hand, such that the individuality and separateness between them ceased and each of the LINX Entities is the alter ego of Defendants Linx Ltd., Hammond, J. Senn and Senn in that, among other things: (a) Defendants Linx Ltd., Hammond, J. Senn and Senn controlled, dominated, managed and operated each of the LINX Entities as their alter egos; (b) Defendants Linx Ltd., Hammond, J. Senn and Senn made all material decisions pertaining to each of the LINX Entities; (c) there has been a failure to comply with or observe the formalities of corporate formation and/or operation of each of the LINX Entities; (d) each of the LINX Entities was inadequately capitalized to carry out its intended business and pay its debts and obligations as they fell due; and (e) the individuality of each of the LINX Entities is a total sham and fiction such that upholding its corporate nature and allowing Defendants Linx Ltd., Hammond, J. Senn and Senn to escape personal liability for any entity debts would sanction a fraud or promote an injustice and should therefore be disregarded pursuant to the doctrine of piercing the corporate veil.  Consequently, each such defendant is liable to Plaintiff on this contract claim.

72.     As a direct and proximate result of Defendants' breaches of the Settlement Agreement, Plaintiff has suffered damages of no less than $939,010.38, which reflects Settlement Sum that Linx Card agreed to pay under the Settlement Agreement. Plaintiff has therefore been damaged in an amount to be proved at time of trial but in no event less than $939,010.38, all of which is readily and clearly ascertainable.

73.     Plaintiff is also entitled to its reasonable attorneys' fees and all costs incurred in collecting the Settlement Sum and enforcing its rights against all named defendants under the Settlement Agreement.

### THIRD CAUSE OF ACTION

### DECEIT

(By Plaintiff Against Linx Card and Hammond)

74.     Plaintiff restates and hereby incorporates the allegations contained in each of the foregoing Paragraphs of this Complaint as though set forth in full.

75.     Linx Card and Hammond expressly represented that Linx Card "is and will be the sole owner of the Collateral," as described in the Security Agreement.

76.     That representation was knowingly false when made because Linx Card did not own the "$920,506.82 plus interest presently maintained by First Data Merchant Services LLC, First Data Merchant Corporation, any other First Data entity and any acquirer associated with First Data" to which they granted Plaintiff a security interest, as reflected in the Description of Collateral set forth in Exhibit A to the Security Agreement. Instead, GIVV and Pelican held the subject merchant account at First Data and owned these funds.

77.     Linx Card and Hammond made this representation with the intent to defraud Plaintiff and induce Plaintiff's reliance.

78.     Plaintiff justifiably relied on the truth of this representation in deciding to forego immediate litigation and entering into the Settlement Agreement and Security Agreement with Linx Card. Linx Card and Hammond knew that the true facts regarding the ownership these funds were known and accessible only to Defendants.

79.     Plaintiff has suffered monetary damages in an amount to be proven at trial as a direct and proximate result of Defendants' fraud.

80.     Plaintiff's reliance on Linx Card and Hammond's representations was a substantial factor in Plaintiff's harm because, but for those representations, Plaintiff would never have entered into the Settlement Agreement and/or Security Agreement, would have insisted on the true owner of the merchant account through which Linx Card caused Plaintiff's transactions to be processed being a party to the Security Agreement, and/or would have immediately filed suit against each of the LINX Entities and Pelican.

1      81.    Linx Card and Hammond's wrongful acts as described herein were intentional,

2   malicious, oppressive and fraudulent, and were committed with reckless disregard of harm to

3   Plaintiff, in willful and conscious disregard of Plaintiff's rights, such that Plaintiff is entitled to

4   recover punitive and exemplary damages against Linx Card and Hammond in an amount that is

5   sufficient and appropriate to punish Linx Card and Hammond, as well as to deter them from

6   committing similar acts in the future.

7                             **FOURTH CAUSE OF ACTION**

8                                 **CONVERSION**

9                   (By Plaintiff Against All Defendants)

10     82.    Plaintiff hereby restates and incorporates the allegations contained in each of the

11  foregoing Paragraphs of this Complaint as though set forth in full.

12     83.    Plaintiff owns and has a right to immediately access, possess and control the proceeds

13  of the transactions Plaintiff submitted to Linx Card pursuant to the contract between the parties,

14  which Linx Card caused to be processed through an account held in the name of one of the Linx

15  Entities or a company or individual associated with the Defendants, in the amount of the Outstanding

16  Balance.

17     84.    Plaintiff also has an immediate legal right to possess the funds being held by First

18  Data in connection with this merchant account up to the Judgment Amount, as pledged by Linx Card

19  pursuant to the Security Agreement, and as ordered by the District Court of Clark County, Nevada

20  in the enforcement action.

21     85.    Each of the Defendants has intentionally and substantially interfered with Plaintiff's

22  right to possession of these funds.

23     86.    Linx Card, Senn and Hammond have prevented Plaintiff from having access to these

24  funds by falsely representing that First Data was holding the funds on behalf of Linx Card, and

25  concealing the fact that First Data was actually holding the funds on behalf of the account-holder

26  associated with the Defendants, and fraudulently inducing Plaintiff to rely on a Security Agreement

27  that purported to grant rights to collateral that Linx Card does not own.

28

1  87. First Data has prevented Plaintiff from having access to these funds by refusing to

2 transfer them to Plaintiff's control, notwithstanding its awareness that the funds being held by First

3 Data on behalf of the designated account-holder flow from Plaintiff's processing activity with Linx

4 Card, and its awareness of the fraud perpetrated by Senn and Hammond as the principals of both

5 Linx Card and the other Linx Entities. All LINX Entities are alter egos of each other and, therefore,

6 Plaintiff has a right and interest to any funds maintained in the names of GIVV and Pelican due and

7 owing to Plaintiff.

8  88. In fact, on or about October 22, 2019, a document assigning $989,010.38 held in the

9 name of Pelican and/or GIVV was delivered to First Data, pursuant to which any and all funds up

10 to the amount of $989,010.38 was assigned to Plaintiff. A true and correct copy of that document

11 is attached as **Exhibit H** hereto and incorporated by reference. Despite the delivery of the subject

12 document, First Data did not transfer funds held in the name of Pelican and/or GIVV to Plaintiff.

13  89. Pelican in assisting Senn, Hammond and Linx Card in surreptitiously allowing Linx

14 Card to use its account with First Data to process transactions related to the Linx Card system, which

15 in turn led to First Data terminating its account and withholding the funds therein, aided and abetted

16 the Linx Defendants and First Data in preventing Plaintiff to having access to its funds.

17  90. Defendants have prevented Plaintiff from having access to these funds, and refused

18 Plaintiff's repeated demands to return these funds to Plaintiff's possession.

19  91. Plaintiff did not consent to this conduct.

20  92. Plaintiff has suffered harm in the amount of the Outstanding Balance and/or

21 Judgment Amount by being deprived of possession of these funds. First Data's conduct was a

22 substantial factor in causing Plaintiff's harm.

23  93. Defendants' wrongful acts as described herein were intentional, malicious,

24 oppressive and fraudulent, and were committed with reckless disregard of harm to Plaintiff, in

25 willful and conscious disregard of Plaintiff's rights, such that Plaintiff is entitled to recover punitive

26 and exemplary damages against Defendants in an amount that is sufficient and appropriate to punish

27 Defendants, as well as to deter them from committing similar acts in the future.

28

# FIFTH CAUSE OF ACTION

## VIOLATION OF PENAL CODE SECTION 496

(By Plaintiff Against All Defendants other than First Data)

94.     Plaintiff hereby restates and incorporates the allegations contained in each of the foregoing Paragraphs of this Complaint as though set forth in full.

95.     Linx Card, Senn and Hammond fraudulently induced Plaintiff to enter into the Settlement Agreement and Security Agreement based on the false representation that First Data was holding the proceeds of Plaintiff's processing activity with Linx Card on behalf of Linx Card in connection with a merchant account held in Linx Card's name, and that Linx Card was the sole owner of the funds being held by First Data. But for these false representations, Plaintiff would have insisted on the true account holder being a party to the Security Agreement as a condition of the Settlement Agreement.

96.     By falsely representing that First Data was holding the funds on behalf of Linx Card, and concealing the fact that First Data was actually holding the funds on behalf of another party, Linx Card, Senn and Hammond defrauded Plaintiff and enabled the account holder to gain control and possession of the funds under false pretense, depriving Plaintiff of access to the funds which Linx Card, Senn and Hammond have acknowledged rightfully belong to Plaintiff.  The funds are currently in the possession of First Data in the name of Pelican.  The money belongs to Plaintiff.

97.     First Data and the LINX Defendants have ignored Plaintiff's repeated demands to turn these funds over to Plaintiff, and First Data and/or other Defendants have continued to maintain control and possession of these funds.

98.     Penal Code section 484 describes acts constituting theft. The first sentence of section 484, subdivision (a) states: "*Every person* who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him or her, or *who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money*, labor or real or personal property, or who causes or procures others to report falsely of his or her wealth or mercantile character and

1 by thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains possession

2 of money, or property or obtains the labor or service of another, *is guilty of theft*." (Italics added.)

3 Section 484 thus defines theft to include theft by false pretense. *Bell v. Feibush* (2013) 212

4 Cal.App.4th 1041, 1042, citing, *People v. Gomez* (2008) 43 Cal.4th 249, 255, fn. 4. Penal Code

5 section 532 also defines criminal fraud "in terms nearly identical to [section] 484, [subdivision ](a)"

6 and "provides that these acts are punishable 'in the same manner and to the same extent' as larceny."

7 *Bell*, 212 Cal.App.4th at 1042.

8   99. In 1927, the Legislature consolidated the separate common law crimes of larceny,

9 embezzlement, and theft by false pretense in Penal Code section 484, subdivision (a).  (Internal

10 Citations Omitted.) The forerunner of Penal Code section 496, Penal Code former section 496bb,

11 was added by statute in 1935, after this consolidation. (Internal Citations Omitted.)  Section 496(c)

12 was enacted in 1972. (Internal Citations Omitted.) Thus, when the Legislature enacted section

13 496(c), it presumably understood that the phrase "a violation of subdivision (a)" would include theft

14 by false pretense. *Bell*, 212 Cal.App.4th at 1042.

15   100. Thus, Linx Card, Senn, and Hammond engaged in theft within the meaning of Penal

16 Code section 496(a) by defrauding Plaintiff by false pretense, and First Data, GIVV, and Pelican

17 have violated Penal Code section 496(a) and injured Plaintiff by receiving and refusing to return

18 these stolen funds to Plaintiff. Accordingly, Plaintiffs are entitled to treble damages against First

19 Data, GIVV, and Pelican in an amount no less than $2,848,679.40 (i.e. three times the Judgment

20 Amount), plus their costs of suit and reasonable attorneys' fees.

21 **SIXTH CAUSE OF ACTION**

22 **UNFAIR COMPETITION IN VIOLATION OF**

23 **BUSINESS AND PROFESSIONS CODE SECTION 17200**

24 (By Plaintiff Against all Defendants)

25   101. Plaintiff hereby restates and incorporates the allegations contained in each of the

26 foregoing Paragraphs of this Complaint as though set forth in full.

27   102. Plaintiff brings this claim on behalf of itself and the public.

28

103.    Defendants, and each of them, have violated California Business and Professions Code § 17200 by engaging in unfair, unlawful, and fraudulent business acts or practices, including the false and fraudulent scheme to defraud its sales representatives, including Plaintiff, as described above.

104.    Defendants' practices are likely to deceive, and have deceived, members of the public, including Plaintiff. Defendants knew, or should have known, that their misrepresentations, omissions, failure to disclosure and/or partial disclosures, and omission of material facts are likely to deceive a reasonable person.

105.    Nonetheless, Defendants continued to make such misrepresentations despite the fact they knew or should have known that their conduct was misleading and deceptive. By engaging in the above-described acts and practices, Defendants each committed one or more acts of unfair competition within the meaning of Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq.

106.    Defendants' conduct, as alleged herein, also constitutes unlawful business practices. Among other things, Defendants violated the California Money Transmission Act (embodied in California Financial Code §§ 2000 – 2176), California Penal Code §496, federal regulatory statutes, including the Federal Trade Commission Act and the Telemarketing Sales Rule, and engaged in a host of federal crimes, including but not limited to 18 U.S.C. § 1029 (factoring), 18 U.S.C. § 1029(b)(2) (conspiracy), 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1344 (bank fraud), and 18 U.S.C. §§ 1956 and 1957 (money laundering).

107.    Plaintiff suffered injury in fact as a result of Defendants' unfair and unlawful methods of competition, including the submission of customer credit card transactions based on agreed upon terms followed by Defendants' conversion of funds rightfully owed to Plaintiffs.  As a proximate result of Defendants' conduct, Plaintiffs suffered a loss of money and/or property.

108.    Plaintiff seeks restitution of the monies retained by Defendants in the amount to be proven at trial, but which total no less than $939,010.38.

109.    Plaintiff also seeks an order of this Court enjoining Defendants from continuing their

1    deceptive business practices.

2         110.    Plaintiff seeks an order of this Court against Defendants, and each of them, awarding

3    Plaintiff's restitution under § 17200, et seq., plus interest, and attorneys' fees and costs pursuant to

4    Civil Code § 1021.5.

5                                **SEVENTH CAUSE OF ACTION**

6                                        **NEGLIGENCE**

7                   (By Plaintiff Against all Defendants other than First Data)

8         111.    Plaintiff hereby restates and incorporates the allegations contained in each of the

9    foregoing Paragraphs of this Complaint as though set forth in full.

10        112.    Defendants voluntarily came into possession of funds flowing from Plaintiff's card

11   transactions which they owed a duty to remit to Plaintiff after taking their agreed upon fees.

12   Defendants failed to exercise reasonable care in the payment structures and agreements they set up

13   in connection with Plaintiff's funds.  Defendants breached the duty of care and failed to adhere to

14   appropriate practices with respect to Plaintiff's funds and by failing to adhere their practices to the

15   enumerated laws.

16        113.    Defendants' negligent conduct, as alleged herein, was the direct, legal and proximate

17   cause of Plaintiff's significant injuries, suffering and losses.

18        114.    Defendants' damages amount to no less than $939,010.38.

19                                   **PRAYER FOR RELIEF**

20   Plaintiff prays for judgment against Defendants as follows:

21        1.    For general damages according to proof;

22        2.    For special damages according to proof;

23        3.    For exemplary and punitive damages according to proof and in an amount

24   sufficient to punish and set an example of Defendants, and each of them;

25        4.    For treble damages;

26        5.    For interest due according to proof, including but not limited to prejudgment

27   interest;

28

6.    For attorneys' fees according to proof;

7.    For costs of suit herein incurred; and

8.    For such other and further relief as the court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a trial by jury on all issues triable by a jury.

Dated: October 25, 2019

ROME & ASSOCIATES, A.P.C.
Eugene Rome

By: _____
      EUGENE ROME
Attorneys for Plaintiff
MM DEVELOPMENT COMPANY
INC. doing business as PLANET 13

23
COMPLAINT

EXHIBIT A

# AGREEMENT

This Agreement is made and entered into by and between MM Development Company, Inc., dba Planet 13, a Nevada corporation ("MMDC") and Linx Card, Inc., a Delaware corporation ("Linx") in connection with an outstanding debt arising from a business relationship by and between MMDC and Linx (collectively, Linx and MMDC shall be referred to as the "Parties") with the Effective date of July 12, 2019.

## RECITALS

**WHEREAS**, MMDC and Linx were involved in a business relationship at the conclusion of which, Linx owed MMDC the sum of Nine Hundred Thousand, Five Hundred and Six Dollars and Eighty-Two Cents ($900,506.82).

**WHEREAS**, Linx acknowledges that the aforementioned sum owed is presently due and collectible and that MMDC has the right to seek its immediate payment or commence a legal action to recover the subject amount.

**WHEREAS**, rather than commence immediate collections, MMDC has agreed to allow Linx up to and including August 15, 2019 to repay the funds subject to the terms and conditions set forth herein.

## TERMS

**NOW, THEREFORE**, in exchange for good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. **Adoption of Recitals.** The Parties hereby adopt and incorporate in full into this Agreement the Recitals set forth above.

2. **Consideration.**

    a. On or by August 15, 2019, Linx shall pay to MMDC the principal sum of $900,506.82 in principal debt owed, plus interest accrued since June 1, 2019 at the rate of ten percent (10%) per annum,[1] plus attorneys' fees in the amount of $20,000.00. For avoidance of doubt, should the term of this Agreement be extended, interest until such time as the entire amount owed is paid in full.

    b. Linx shall further execute a Confession of Judgment in such form as is attached as Exhibit A hereto, which Confession of Judgment shall not be filed of record, entered or recorded as long as Linx has made payment in full of the $939,010.38 sum due on or by August 15, 2019.

    c. Linx hereby conveys to MMDC a security interest in all of its assets in the amount of $939,010.38. A copy of the Security Agreement is attached as Exhibit B hereto.

    d. Linx shall identify the following information, in writing, within 5 business days of this Agreement: (1) its account/MID at First Data; (2) the name, phone number and e-mail address of the First Data representative(s) primarily handling this relationship. MMDC, for its part, agrees not to contact First Data regarding its rights under this Agreement unless and until it deems it necessary to do so, which determination shall be made in its sole

---

[1] Assuming a payment date of August 15, 2019, the interest is calculated to be $18,503.56. If the outstanding obligation is pre-paid, interest is to be adjusted accordingly.

discretion.

e.  Linx agrees that in the event that the filing of the Confession of Judgment does not result in the immediate entry of a final and collectible judgment, then Linx agrees that MMDC shall have the right to apply for judgment, whether in the form of the Confession of Judgment or otherwise, upon *ex parte* notice, with the sole defense to the subject application being actual evidence of payment of all or a portion of the debt by Linx. All other defenses and appellate rights are hereby knowingly waived and forfeited.

f.  Linx further agrees that in the event that MMDC elects to pursue any pre-judgment or post-judgment remedy that carries with it a bonding requirement, any such requirement would be waived to the fullest extent of the law.

3.    All payments mandated by this Agreement shall be made in lawful money of the United States of America in same day funds, without offset, deduction, or counterclaim of any kind or nature, by cashier's check or wire directed to MMDC's account presently on file with Linx.

4.    All sums remaining unpaid under this Agreement become immediately due and payable, without notice, demand, or presentment, and regardless of any prior forbearance, on the occurrence of any of the following events:

a.  Any failure to make a payment when due under the terms of this Agreement. No grace period or obligation to provide pre-default notice shall be required;

b.  The filing of a petition in bankruptcy by, or the initiation of any proceeding under any bankruptcy or insolvency laws against Linx; or

c.  The making of a general assignment for the benefit of creditors by Linx;

5.    The Parties intend to comply with all applicable usury laws. In fulfilling this intention, this Agreement is expressly limited so that the amount of interest paid or agreed to be paid to MMD for the use, forbearance, or detention of money under this Agreement may not exceed the maximum amount permissible under applicable law. If for any reason payment or collection of any amount required under this Agreement is prohibited by law, the obligation will be reduced to the maximum allowed by law. If any conflict arises between this provision and any provision of this Agreement, this provision controls.

6.    Diligence, demand, presentment, notice of dishonor, and protest are waived by Linx.

7.    Time is of the essence for each and every obligation under this Agreement.

8.    In the event that enforcement of this Agreement is required, Linx shall further become liable for all costs and expenses, including, without limitation, reasonable attorneys' fees, costs, and disbursements (collectively "Attorney Fees") expended or incurred by MMDC in any way in interpreting, restructuring, collecting, or otherwise enforcing this Agreement or MMDC's rights hereunder, whether or not a legal proceeding is filed. Attorneys' Fees shall include, without limitation, attorney fees and costs incurred in any state, federal, or federal bankruptcy court and in any insolvency proceeding, mediation, or arbitration of any kind in any way related to this Agreement.



9.      No delay or omission to exercise any right, power, or remedy accruing to MMDC under this Agreement will impair any right, power, or remedy of MMDC, nor will it be construed as a waiver of, or consent to, any breach or default. No waiver of any breach, any failure of a condition, or any right or remedy under this Agreement (1) will be effective unless it is in writing and signed by the Party making the waiver; (2) will be deemed to be a waiver of, or consent, to any other breach, failure of a condition, or right or remedy, or (3) will be deemed to constitute a continuing waiver unless the writing expressly so states.

10.     Agreement may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of MMDC, but only by an agreement in writing signed by Linx and the MMDC.

11.     All notices and other communications required or permitted by this Agreement must be in writing and must be (a) delivered to the appropriate address by hand, by nationally recognized overnight service or by courier service (costs prepaid) or sent by registered or certified mail, return receipt requested, in each case to the following addresses, and marked to the attention of the person (by name or title) designated below (or to such other address, or person as a party may designate by notice to the other parties in accordance with this paragraph):

*If to Linx:*

Sanjiv Dhawan, Esq.
Linx Card, Inc.
2121 N. California Blvd., Suite 275
Walnut Creek, CA 94596
E-mail: sanjiv@linx.us

*If to MMDC:*

Eugene Rome, Esq.
Rome & Associates, APC
2029 Century Park East, Suite 450
Los Angeles, CA 90067
E-mail: erome@romeandassociates.com

12.     <u>Governing Law; Interpretation</u>. This Agreement shall be governed by the laws of the State of Nevada without reference to the conflicts of law principles of that State. The headings of sections and paragraphs in this Agreement are for convenience only and shall not be construed in any way to limit or define the content, scope, or intent of the provisions hereof. As used in this Agreement, the singular shall include the plural, and masculine, feminine, and neuter pronouns shall be fully interchangeable, where the context so requires. If any provision of this Agreement, or any paragraph, sentence, clause, phrase, or word, or the application thereof, in any circumstances, is adjudicated by a court of competent jurisdiction to be invalid, the validity of the remainder of this Agreement shall be construed as if such invalid part were never included herein. Time is of the essence of this Agreement.

13.     <u>Representations and Warranties</u>. Linx hereby represents and warrants to MMDC the following, each of which is a continuing representation and warranty:



a.  This Agreement is a valid and binding obligation of Linx, enforceable against it in accordance with its terms;

b.  Except as otherwise expressly provided in this Agreement, no consent or approval is required by any other person or entity in order for Linx to carry out the provisions of this Agreement, and Linx and its Chief Executive Officer, Patrick Hammond, has obtained all necessary corporate and other approval to enter into and perform the obligations under this Agreement.

c.  Linx and Patrick Hammond, personally, each represents, warrants and covenants that he/it has full power and authority to execute this Agreement and that he/it has obtained all necessary approvals, consents and authorizations required for he/it to execute and deliver this Agreement.  Patrick Hammond is executing this Agreement on behalf of Linx and he has been duly authorized and empowered to execute and deliver this Agreement on behalf of Linx.

14.  This Agreement, including all rights and duties set forth in it, was mutually prepared by the Parties and any ambiguity may not be interpreted for or against any Party.

15.  In the event any provision of this Agreement is determined by any court or tribunal of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of said provision and this Agreement shall nevertheless remain fully valid and enforceable.

16.  All rights and obligations set forth in this Agreement that are by their nature required to be performed or apply after the execution shall survive the execution of this Agreement and shall remain in full force.

IN WITNESS WHEREOF, the undersigned Parties have executed this Agreement as the date written above.


Linx Card, Inc.

By: _____
Name: Patrick Hammond
Its: Chief Executive Officer


MM Development Company, Inc., dba Planet 13

By: _____
Name: Leighton Koehler
Its: Corporate Secretary / General Counsel

EXHIBIT B

1   ROME & ASSOCIATES, A.P.C.
    Eugene Rome (SBN 232780)
2   erome@romeandassociates.com
    Sridavi Ganesan (SBN 216129)
3   sganesan@romeandassociates.com
    2029 Century Park East, Suite 450
4   Los Angeles, California 90067
    Telephone: (310) 282-0690
5   Facsimile: (310) 282-0691

6

7   *Attorneys for*
    MM DEVELOPMENT COMPANY, INC.,
8   DBA PLANET 13

9                          **DISTRICT COURT**

10                     **CLARK COUNTY, NEVADA**

11

12  MM DEVELOPMENT COMPANY, INC. dba        Case No.:
    PLANET 13, a Nevada corporation
13                                           Dept:
                  Plaintiff,
14                                           **CONFESSION OF JUDGMENT**
          vs.
15
    LINX CARD, INC., a Delaware corporation
16
                  Defendant.
17

18  STATE OF NEVADA        )
19                         )ss:
20  COUNTY OF CLARK        )

21       I, Patrick Hammond, being first duly sworn upon their oath, depose and state as follows:

22       1.    That your Affiant is the Chief Executive Officer of Linx Card, Inc., a Delaware

23  corporation ("Linx" or "Defendant"), the Defendant named herein, and your Affiant has personal

24  knowledge of all matters stated herein.

25       2.    That your Affiant, on Defendant's behalf, hereby confesses judgment in favor of

26  Plaintiff MM Development Company, Inc., a Nevada corporation ("Plaintiff"), and authorizes

27  entry of judgment against Defendant in the principal sum of $900,506.82 plus accrued interest in

28  the sum of $9,128.45 with interest on the principal sum at the rate of ten percent (10%) per

                                          1
                          CONFESSION OF JUDGMENT

1   annum from June 1, 2019, plus attorneys' fees in the amount of $20,000.00, as of the date of this

2   Confession of Judgment and any attorneys' fees which may be incurred thereafter, and all costs

3   accrued after Judgment.

4        3.      This Confession of Judgment is for a debt justly due from your Defendant to

5   Plaintiff and arises upon the following facts:

6              3.1     That Defendant provided certain payment services to Plaintiff, at the

7   conclusion of which, the sum of $900,506.82 remained due and owing to Plaintiff as of, at least,

8   June 1, 2019.

9        4.      Defendant hereby agrees to repay Plaintiff, the principal sum of $900,506.82 plus

10  accrued interest in the sum of $9,128.45 with interest on the principal sum at the rate of ten

11  percent (10%) per annum from June 1, 2019, plus attorneys' fees in the amount of $20,000.00, as

12  of the date of this Confession of Judgment and any attorneys' fees which may be incurred

13  thereafter, and all costs accrued after Judgment, as follows:

14             4.1     On the 15th day of August, 2019, Defendant shall pay to Plaintiff, the sum

15  of $939,010.38 until the amount of the judgment is extinguished.

16             4.2     Said payment shall be made payable to Plaintiff and mailed or delivered to

17  the offices of Plaintiff, and shall be received by said offices on or before the aforementioned

18  date, August 15, 2019.

19       5.      It is hereby understood and expressly agreed by the parties hereto that:

20             5.1     So long as Defendant is in full compliance with each and every one of the

21  terms contained herein, particularly those items outlined in paragraphs 4 and 4.1, this Confession

22  of Judgment shall not be filed of record, entered or recorded; however,

23             5.2     Should Defendant be delinquent on any payment due to Plaintiff, then

24  Plaintiff shall be entitled to file and record the foregoing Confession of Judgment without the

25  benefit of notice to the Defendant and Plaintiff shall be entitled to any post-judgment costs and

26  attorneys'

27  ///

28  ///

CONFESSION OF JUDGMENT

1  fees resulting from the entry of this Confession of Judgment.

2

3  DATED this 12 day of July 2019.

4

5

6

7  It is hereby acknowledged that

8  Pat Hammond executed

the foregoing document by his/her

9  own hand before me on

this 12 day of July, 2019.

10

11  NOTARY PUBLIC

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

CONFESSION OF JUDGMENT

1       I, Patrick Hammond, the Chief Executive Officer of Linx Card, Inc., being first duly
2   sworn upon their respective oath, depose and state:

3       That Linx Card, Inc. is party referred to in the foregoing CONFESSION OF
4   JUDGMENT.

5       That I have the requisite corporate authority to execute this CONFESSION OF
6   JUDGMENT on Linx Card, Inc.'s behalf.

7       That, in my capacity as the CEO of Linx Card, Inc. and on its behalf, I have made and
8   signed the above and foregoing CONFESSION OF JUDGMENT.

9       That Linx Card, Inc. is justly and truly indebted to Plaintiff in the principal sum of
10  $900,506.82 plus accrued interest in the sum of $9,128.45 (plus such additional interest as shall
11  accrue following execution of this CONFESSION) with interest on the principal sum at the rate
12  of ten percent (10%) per annum from June 1, 2019, plus attorneys' fees in the amount of
13  $20,000.00, as of the date of this Confession of Judgment and all costs accrued after Judgment.

14      That I have read the above and foregoing CONFESSION OF JUDGMENT and know and
15  understand the contents thereof; that I have personal knowledge of the facts therein stated, and
16  the same are true of my own knowledge.

17

18                                                 Patrick Hammond, CEO of Defendant
19                                                 Linx Card, Inc.

20
21  It is hereby acknowledged that
                executed
22  the foregoing document by his/her             SEE ATTACHED
    own hand before me on
23  this _____ day of _____, _____.

24                                              See Attached
                                            for
25  NOTARY PUBLIC                                Notary Public

26
27
28

                                   4
                        CONFESSION OF JUDGMENT

# CALIFORNIA ACKNOWLEDGMENT CERTIFICATE

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document, to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State Of: **California**
County Of: **Contra Costa**

On _July 12th_, 2019 before me, **Haresh M. Rajani**, Notary Public, personally appeared, _Patrick Hammond_ _____ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/~~are~~ subscribed to the within instrument and acknowledged to me that ~~she~~/he/~~they~~ executed the same in ~~her~~/his/~~their~~ authorized capacity(~~ies~~), and that by ~~her~~/his/~~their~~ signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under **PENALTY OF PERJURY** under the laws of the State of California that the foregoing paragraph is true and correct.

**WITNESS my hand and official seal.**

Signature: **Haresh M. Rajani**

HARESH M. RAJANI
COMM. #2224670
Notary Public - California
Contra Costa County
My Comm. Expires Dec. 8, 2021

*Seal*

Title of Document: _Confession of Judgment_

Total Number of Pages including Attachment: _____

Notary Commission Expiration Date: Dec. 8th, 2021

Notary Commission Number: 2224670

EXHIBIT C

### SECURITY AGREEMENT

THIS SECURITY AGREEMENT (the "Security Agreement") is made as of July 12, 2019, by LINX CARD, INC., a Delaware corporation ("Debtor") for the benefit of MM DEVELOPMENT COMPANY, INC. dba PLANET 13, a Nevada corporation (the "Secured Party") ("Debtor" and "Secured Party" shall each be called a "Party" and collectively, "Parties").

### Factual Background

A.     This Security Agreement is executed by Debtor for the purpose of inducing Secured Party to refrain from immediate collection of Nine Hundred Twenty Thousand, Five Hundred and Six Dollars and Eighty-Two Cents ($920,506.82), consisting of $900,506.82 in principal and $20,000 in attorneys' fees, plus interest accruing at the rate of ten percent (10%) per annum from June 1, 2019, presently owed to Secured Party by the Debtor (the "Debt"). The Debt is evidenced by an Agreement of even date, to which this Security Agreement is an exhibit, as Exhibit B (the "Agreement").

B.     Debtor has agreed to grant to Secured Party a first priority perfected security interest in all the property of Debtor, whether presently owned by Debtor or hereafter acquired, as described in Exhibit A attached hereto (collectively, the "Collateral"). Debtor has agreed to the subject transaction to avoid the filing of an immediate lawsuit by Secured Party and acknowledges that the subject consideration is ample and adequate.

C.     The parties desire to agree as set forth below.

NOW, THEREFORE, with reference to the above recitals, and in reliance thereon, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1.     Creation of Security Interest. Debtor hereby grants to Secured Party a security interest in, and does hereby collaterally assign, pledge, mortgage, convey and set over unto the Secured Party, all of Debtor's present and hereafter acquired right, title and interest in and to the Collateral, for the purpose of securing payment of all indebtedness, obligations and liabilities of Debtor to Secured Party evidenced by or arising under or in connection with the Agreement, the Security Agreement, including but not limited to the Debt, and all other agreements entered into concurrently therewith (collectively the "Loan Documents") and performance of all agreements, covenants, terms and conditions contained in the foregoing documents and instruments (all obligations of Debtor as described in this Section 1 shall be collectively referred to herein as the "Obligations").

2.     Warranties, Representations and Covenants of Debtor. Debtor hereby warrants, represents and covenants as follows:

(a)     Debtor is and will be the sole owner of the Collateral, free from any lien, security interest, encumbrance or adverse claim of any kind. Debtor will not permit any financing statement to be filed with respect to the Collateral or any portion thereof, except in favor of Secured Party. Debtor will notify Secured Party of, and will defend the Collateral against, all claims and demands of all persons at any time claiming the same or any interest therein.

(b)     The Collateral will not be used and was not purchased for personal, family or household purposes.

(c)     Subject to the terms of Subparagraph 2(e) and other than the funds on deposit with First Data, the Collateral will be kept on the business premises of Debtor, and Debtor will not remove the Collateral from the Premises without the prior written consent of Secured Party.

(d)     Debtor authorizes Secured Party to file one or more financing statements identifying the Collateral and evidencing the security interest of Secured Party in the Collateral pursuant to the requirements of the



Uniform Commercial Code and in form satisfactory to Secured Party. Debtor will pay cost of filing the same in all public offices wherever filing is deemed by Secured Party to be necessary or desirable. Secured Party will refrain from effectuating an immediate filing of such a financing statement but reserves the right to do so until such time as it deems it necessary in its sole discretion.

(e)     Without the prior written consent of Secured Party, Debtor will not sell, exchange, dispose of, lease, offer to sell or otherwise transfer or otherwise deal with the Collateral or any portion or interest therein, unless simultaneously therewith new items of Collateral, which items may be similar to those proposed to be disposed of and which shall be of equal or greater value, are substituted therefor. Debtor shall file with the Secured Party a certificate signed by Debtor describing such portion of the Collateral as is being so disposed of and stating that the same has become obsolete, worn out, damaged, destroyed, sold, transferred, or exchanged, and that such portion of the Collateral will be replaced immediately upon the removal thereof. Such certificate likewise shall certify as to the reasonable and equivalent value of the property as acquired or to be acquired in replacement or substitution. All after-acquired property of the Debtor located on the Premises and all additions or replacements acquired pursuant to the provisions of this paragraph shall immediately be and become, without any other act on the part of the Debtor, subject to the security interest and lien of this Security Agreement, which security interest shall be prior to any other security interest or lien on such property. Unless expressly recited or provided to the contrary in this Security Agreement or in the other Loan Documents, Debtor may not hereafter acquire any property to be located on the Premises subject to prior security interests. If the Collateral or any part thereof is sold, transferred, exchanged, or otherwise disposed of, the security interest of Secured Party shall extend to the proceeds of such sale, transfer, exchange or other disposition.

(f)     Debtor shall cause the Collateral at all times to be kept insured at its own expense under one or more policies with such companies, for such periods and amounts, against such risks and liabilities, and in such form as are reasonably satisfactory to the Secured Party, with Secured Party as a named insured and with loss payable to the Secured Party and mortgagee clauses attached to all policies in favor of and in form satisfactory to Secured Party. Such insurance policies shall provide for at least thirty (30) days prior written notice to Secured Party of cancellation, termination, lapse, reduction in amount or material change in coverage of such policies, and shall be delivered to and held by Secured Party, together with evidence of payment of premiums thereon. Debtor will promptly notify Secured Party of any loss or damage to the Collateral and will not adjust or settle such or any loss without the written consent of the Secured Party. In the event of foreclosure or sale under this Security Agreement, all right, title and interest of the Debtor in and to any insurance policies then in force shall pass to the purchaser at any sale, and Secured Party is hereby appointed attorney-in-fact for Debtor to assign and transfer said policies. In the event of damage or casualty resulting in a loss payable under any of the aforementioned insurance policies, Secured Party is authorized (i) to adjust and settle any claim under the appropriate policy pursuant to which right Secured Party is hereby appointed attorney-in-fact for Debtor to make proof of loss, or (ii) to allow Secured Party on behalf of and in the name and stead of Debtor to adjust and settle any such claim. In either case, Secured Party is authorized to collect and receipt for any such insurance proceeds paid pursuant to the settlement and such authorization is hereby deemed an assignment to Secured Party by Debtor of its rights to any such proceeds.

(g)     Debtor will keep the Collateral in good condition and repair. From time to time and at the request of Secured Party, Debtor will make necessary or desirable repairs, replacements, renewals and additions to the Collateral which may be required by reason of use, wear, obsolescence, damage or destruction, however caused, to the end that the efficiency of the business conducted on the Premises shall not be impaired. Debtor will not misuse, abuse, allow to deteriorate, waste or destroy the Collateral or any part thereof, except for ordinary wear and tear in the course of its normal and expected use. Debtor will not use the Collateral in violation of any statute or governmental rule, regulation or ordinance.

(h)     Debtor will pay prior to delinquency all taxes and assessments assessed against the Collateral, imposed on account of its use or operation or imposed upon the Secured Party's Note ("Impositions") and shall deliver to Secured Party, within ten (10) days after the due date of each Imposition, a receipt or other evidence satisfactory to Secured Party of the payment thereof.

(i)     At the Secured Party's request, Debtor will execute any document, will procure any document and will do all other acts which from the character or use of the Collateral may be reasonably necessary to protect the Collateral against the rights, claims or interests of third persons, and will otherwise preserve the Collateral as security hereunder.



(j)        Debtor shall furnish promptly to Secured Party such information concerning the Collateral as Secured Party may from time to time request. Debtor shall permit and hereby authorizes Secured Party to examine and inspect the Collateral and any portion thereof wherever the same may be located. Following an Event of Default (as hereinafter defined), Debtor shall, at the request of Secured Party, assemble the Collateral or such portion thereof as may be designated by Secured Party, together with all documents and records pertaining thereto, at such place as Secured Party may designate.

(k)        The Debtor shall mark its books and records as may be necessary or appropriate to evidence, protect and perfect the Secured Party's security interest in the Collateral. Such security interest constitutes a valid, first priority security interest in the presently existing Collateral, and will constitute a valid, first priority security interest in Collateral acquired after the date hereof, in each case, to the extent that a security interest in such Collateral can be perfected by the filing of a financing statement or, in the case of Collateral consisting of instruments, documents, chattel paper or certificated securities, to the extent that Secured Party takes possession of such Collateral.

(l)        The Debtor shall take all action that may be necessary or desirable, or that the Secured Party may request, so as at all times to maintain the validity, perfection, enforceability and priority of the Secured Party's security interest in the Collateral or to enable the Secured Party to protect, exercise or enforce its rights hereunder and in the Collateral, including, but not limited to, (i) delivering to the Secured Party, endorsed or accompanied by such instruments of assignment as the Secured Party may specify, and stamping or marking, in such manner as the Secured Party may specify, any and all chattel paper, instruments, letters of credits and advices thereof and documents evidencing or forming a part of the Collateral, (ii) entering into warehousing, lockbox and other custodial arrangements satisfactory to the Secured Party, and (iii) executing and delivering financing statements, instruments of pledge, mortgages, hypothecs notices and assignments, in each case in form and substance satisfactory to the Secured Party, relating to the creation, validity, perfection, maintenance or continuation of the Secured Party's security interest under the Nevada Uniform Commercial Code or other applicable law. All charges, expenses and fees the Secured Party may incur in doing any of the foregoing, and any taxes relating thereto, shall, at Secured Party's request, be charged to Debtor and added to the Obligations and bear interest at the Default Interest Rate as specified in the Note, or, at the Secured Party's option, shall be paid to the Secured Party immediately upon demand.

(m)        With respect to the Collateral, at the time the Collateral becomes subject to the Secured Party's security interest: (a) the Debtor shall be the sole owner of and fully authorized and able to sell, transfer, pledge and/or grant a security interest with the agreed priority in each and every item of the Collateral to the Secured Party; (b) each document and agreement executed by the Debtor or delivered to the Secured Party in connection with this Security Agreement shall be true and correct in all respects; and (c) all signatures and endorsements of the Debtor that appear on such documents and agreements shall be genuine and the Debtor shall have full capacity to execute same.

(n)        At any time during the continuance of an Event of Default, the Debtor shall, and the Secured Party may, at its option, instruct all builders, customers, suppliers, carriers, forwarders, warehousers or others receiving or holding cash, checks, documents or instruments in which the Secured Party holds a security interest to deliver same to the Secured Party and/or subject to the Secured Party's order and if they shall come into any Debtor Party's possession, they, and each of them, shall be held by such Debtor Party in trust as the Secured Party's trustee, and such Debtor Party will immediately deliver them to the Secured Party in their original form together with any necessary endorsement.

(o)        At all reasonable times the Secured Party shall have full access to and the right to audit, check, inspect and make abstracts and copies from the Debtor's books, records, audits, correspondence and all other papers relating to the Collateral and the operation of the Debtor's business. The Secured Party and its agents may enter upon any of the Debtor Parties' premises at any time during business hours and at any other reasonable time, and from time to time, for the purpose of inspecting the Collateral and any and all records pertaining thereto and the operation of such Debtor's business.

(p)        The Debtor's chief executive office is located at 2121 N. California Blvd., Suite 275, Walnut Creek, CA 94596. Until written notice is given to the Secured Party by the Debtor of any other office at which the Debtor keeps its records pertaining to the Collateral, all such records shall be kept at such executive office.



(q)     At any time following the occurrence and continuance of an Event of Default past any applicable cure period, the Secured Party shall have the right to send notice of the assignment of, and the Secured Party's security interest in, the Collateral to any and all customers or any third party holding or otherwise concerned with any of the Collateral. Thereafter, the Secured Party shall have the sole right to collect any monies owed in connection with the Collateral, take possession of the Collateral, or both.

(r)     At any time following the occurrence and continuance of an Event of Default past any applicable cure period, the Secured Party shall have the right to receive, endorse, assign and/or deliver in the name of the Secured Party or Debtor any and all checks, drafts and other instruments for the payment of money relating to the Collateral, and the Debtor, on behalf of the Debtor, hereby waives notice of presentment, protest and non-payment of any instrument so endorsed. At any time following the occurrence and continuance of an Event of Default, the Debtor hereby constitutes the Secured Party or its designee as the Debtor's attorney with power (i) to endorse Debtor's name upon any notes, acceptances, checks, drafts, money orders or other evidences of payment or Collateral; (ii) to sign Debtor's name on any invoice or bill of lading relating to any of the Accounts, drafts against customers, assignments and verifications of Accounts; (iii) to send verifications of Accounts (as defined under the Nevada Uniform Commercial Code) to any customer; (iv) to demand payment of the Accounts; (v) to enforce payment of the Accounts by legal proceedings or otherwise; (vi) to exercise all of the Debtor's rights and remedies with respect to the collection of the Accounts and any other Collateral; (vii) to settle, adjust, compromise, extend or renew the Accounts; (viii) to settle, adjust or compromise any legal proceedings brought to collect Accounts; (ix) to prepare, file and sign Debtor's name on a proof of claim in bankruptcy or similar document against any customer; (x) to prepare, file and sign the Debtor's name on any notice of lien, assignment or satisfaction of lien or similar document in connection with the Accounts; (xi) to transfer the Collateral into the name of Secured Party; and (xii) to do all other acts and things necessary to carry out this Security Agreement. All acts of said attorney or designee are hereby ratified and approved, and said attorney or designee shall not be liable for any acts of omission or commission nor for any error of judgment or mistake of fact or of law, unless done maliciously or with gross (not mere) negligence; this power being coupled with an interest is irrevocable while any of the Obligations remain unpaid. The Secured Party shall have the right at any time following the occurrence of an Event of Default, to change the address for delivery of mail addressed to the Debtor to such address as the Secured Party may designate and to receive, open and dispose of all mail addressed to the Debtor.

(s)     The Secured Party shall not, under any circumstances or in any event whatsoever, have any liability for any error or omission or delay of any kind occurring in the settlement, collection or payment of any of the Accounts or any instrument received in payment thereof, or for any damage resulting therefrom. Following the occurrence of an Event of Default, the Secured Party may, without notice or consent from Debtor, sue upon or otherwise collect, extend the time of payment of, compromise or settle for cash, credit or upon any terms any of the Collateral or any other securities, instruments or insurance applicable thereto and/or release any obligor thereof. The Secured Party is authorized and empowered to accept following the occurrence of an Event of Default or Default the return of the goods represented by any of the Accounts, without notice to or consent by Debtor, all without discharging or in any way affecting the Debtor's liability hereunder.

3.     **Preservation of Collateral by Secured Party**. Should Debtor fail or refuse to make any payment, perform or observe any other covenant, condition or obligation, or take any other action required by the terms of this Security Agreement at the time or in the manner herein provided, then Secured Party may, at Secured Party's sole discretion, without notice to or demand upon Debtor, and without releasing Debtor from any obligation, covenant or condition hereof, make, perform, observe, take or do the same in such manner and to such extent as Secured Party may deem necessary to protect its security interest in or the value of the Collateral. Furthermore, Secured Party may commence, defend, appeal or otherwise participate in any action or proceeding purporting to affect its security interest in or the value of the Collateral. Debtor hereby agrees to reimburse Secured Party on demand for any payment made, or any expense incurred by Secured Party pursuant to the foregoing authorization (including court costs and attorneys' fees and disbursements), and agrees further to pay interest thereon from the date of said payment or expenditure at the Default Interest Rate as specified in the Note.

4.     **Use of Collateral by Debtor**. Until occurrence of an Event of Default hereunder, Debtor may have possession of the Collateral and use it in any lawful manner contemplated in the Loan Documents and consistent with this Security Agreement and any policy of insurance affecting the Collateral.



5.      Event of Default. The occurrence of any of the following shall constitute an Event of Default ("Event of Default") hereunder:

(a)      If an Event of Default (as therein defined) shall occur under any of the Loan Documents and be continuing or if Debtor fails to observe or perform any term, covenant or condition of the Note, this Security Agreement or any of the other Loan Documents and such default is not cured within the time period expressly established therefor, if any; or

(b)      If any writ or any distress warrant shall be issued against or levied on the Collateral, or any part thereof; or if the Debtor shall sell or assign or attempt to sell or assign the Collateral, or any interest therein in violation of Paragraph 2(e) hereof, which event shall not be corrected or cured by Debtor within thirty (30) days after notice thereof by Secured Party; or

(c)      If the Collateral or any part thereof is removed or transferred, or attempted to be removed or transferred, from the Premises, or sold or disposed of, in violation of the terms of Paragraph 2(c) and 2(e), and substitute Collateral is not provided within thirty (30) days thereafter; or

(d)      If any representation or warranty made by Debtor herein, or in any other instrument, agreement or written statement in any way related hereto, to the Collateral or any portion thereof, or to the Loan, shall prove to have been false or incorrect in any material respect on or after the date when made, which representation or warranty is not corrected or made good within thirty (30) days after written notice thereof to Debtor.

6.      Remedies upon Default. Upon the occurrence of an Event of Default, Secured Party may, in addition to exercising those remedies specified in the Note and the other Loan Documents, at any time, at its election, without further notice, and to the extent permitted by law:

(a)      Take immediate action under the Agreement to which this Security Agreement is an attachment.

(b)      Foreclose this Security Agreement and the security interest granted hereby, as provided herein, or in any manner permitted by law, either personally, through agents or by means of a court appointed receiver, and take possession of all or any of the Collateral and exclude therefrom Debtor and all others claiming through or under Debtor, and exercise any and all of the rights and remedies conferred upon Secured Party by the Note, and the other Loan Documents or by applicable law, either concurrently or in such order as Secured Party may determine. Secured Party may sell, lease or otherwise dispose of, or cause to be sold, leased, or otherwise disposed of in such order as Secured Party may determine, as a whole or in such parcels as Secured Party may determine, the Collateral described in this Security Agreement, or exercise any of the rights conferred upon the Secured Party by this Security Agreement, the Note, or other Loan Documents without affecting in any way the rights or remedies to which Secured Party may be entitled under any other Loan Document; and/or

(b)      Make such payments and do such acts as Secured Party may deem necessary to protect its security interest in the Collateral, including without limitation paying, purchasing, contesting or compromising any encumbrance, charge, claim or lien which is prior to or superior to the security interest granted hereunder, and, in exercising any such powers or authority, pay all expenses incurred in connection therewith, and all funds expended by Secured Party in protecting its security interest shall be deemed additional indebtedness secured by this Security Agreement; and/or

(c)      Require Debtor to assemble the Collateral, or any portion thereof, at any place or places designated by Secured Party, and promptly to deliver such Collateral to Secured Party, or an agent or representative designated by it; and/or

(d)      Publicly or privately sell, lease or otherwise dispose of the Collateral, without necessarily having the Collateral at the place of sale, lease or disposition, and upon terms and in such manner as Secured Party may determine. Secured Party may be a purchaser of the Collateral at any public sale. Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Secured



Party will give Debtor reasonable notice of the time and place of any public sale thereof or of the time after which any private sale or any other intended disposition thereof is to be made, and such notice, if given to the Debtor pursuant to the provisions of Paragraph 8 hereof at least ten (10) days prior to the date of any public sale or disposition or the date after which any private sale or disposition may occur, shall constitute reasonable notice of such sale, lease or other disposition; and/or

(e)    Notify any account debtor or any other Party obligated on or with respect to any of the Collateral to make payment to Secured Party or its nominee of any amounts due or to become due thereunder or with respect thereto and otherwise perform its obligations with respect to the Collateral on behalf of and for the benefit of Secured Party. Secured Party may enforce collection and performance with respect to any of the Collateral by suit or otherwise, in its own name or in the name of Debtor or a nominee, and surrender, release, or exchange all or any part thereof; and compromise, extend or renew (whether or not for longer than the original period) or transfer, assign or endorse for collection or otherwise, any indebtedness or obligation with respect to the Collateral, or evidenced thereby, and upon request of Secured Party, Debtor will, at its own expense, notify any person obligated on or with respect to any of the Collateral to make payment and performance directly to, in the name of, and on behalf of Secured Party of any amounts or performance due or to become due thereunder or with respect thereto; and/or

(f)    Exercise any remedies of a secured Party under the Nevada Uniform Commercial Code or any other applicable law.

To effectuate the foregoing, Debtor hereby agrees that if the Secured Party demands or attempts to take possession of the Collateral or any portion thereof in exercise of its rights and remedies hereunder and under any other Loan Document, Debtor will promptly turn over and deliver possession thereof to Secured Party, and Debtor authorizes, to the extent Debtor may now or hereafter lawfully grant such authority, Secured Party, its employees and agents, and potential bidders or purchasers to enter upon any or all of the premises where the Collateral or any portion thereof may at the time be located (or believed to be located) and Secured Party may (i) remove the same therefrom or render the same inoperable (with or without removal from such location), (ii) repair, operate, use or manage the Collateral or any portion thereof, (iii) maintain, repair or store the Collateral or any portion thereof, (iv) view, inspect and prepare for sale, lease or disposition the Collateral or any portion thereof, (v) sell, lease, dispose of or consume the same or bid thereon, or (vi) incorporate the Collateral or any portion thereof into the Premises.

Debtor hereby agrees to indemnify, defend, protect and hold harmless Secured Party and its employees, officers and agents for and against any and all liabilities, claims and obligations which may be incurred, asserted or imposed upon them or any of them as a result of or in connection with any use, operation, lease or consumption of any of the Collateral or as a result of Secured Party's seeking to obtain performance of any of the obligations due with respect to the Collateral, except from such liabilities, claims or obligations as result from gross negligence or intentional misconduct of Secured Party, its employees, officers or agents.

The proceeds of any sale under this Paragraph 6 shall be applied first to the payment of any sums owing to Secured Party pursuant to the provisions of the Agreement, this Security Agreement, or any of the other Loan Documents in such manner as Secured Party may elect, with any funds remaining after payment of the foregoing to be paid to Debtor.

Secured Party shall have the right to enforce one or more remedies hereunder, successively or concurrently, and such action shall not operate to estop or prevent Secured Party from pursuing any further remedy which it may have, and any repossession or retaking or sale of the Collateral pursuant to the terms hereof shall not operate to release Debtor until full payment of any deficiency has been made in cash.

7.    **Other Remedies**. Any and all remedies herein expressly conferred upon Secured Party shall be deemed cumulative with, and not exclusive of, any other remedy conferred hereby or by law or equity on Secured Party, and the exercise of any one remedy shall not preclude the exercise of any other. Except as otherwise specifically required herein, notice of the exercise of any right, remedy or power granted to Secured Party by this Security Agreement is not required to be given.

8.    **Notice**. All notices, consents, approvals or other instruments required or permitted to be given by either party pursuant to this Security Agreement shall be in writing and given by (i) hand delivery, (ii) facsimile, (iii)



express overnight delivery service or (iv) certified or registered mail, return receipt requested, and shall be deemed to have been delivered upon (a) receipt, if hand delivered, (b) transmission, if delivered by facsimile (and if a copy of such notice is also mailed by certified or registered mail, return receipt requested, and deposited with the U.S. Postal Service no later than the first business day after the notice was transmitted by facsimile), (c) the next business day following the date of deposit with the delivery service, if delivered by express overnight delivery service, or (d) the third business day following the day of deposit of such notice with the United States Postal Service, if sent by certified or registered mail, return receipt requested. Notices shall be provided to the parties and addresses (or e-mail, as applicable) specified below:

*If to Linx:*

Sanjiv Dhawan, Esq.
Linx Card, Inc.
2121 N. California Blvd., Suite 275
Walnut Creek, CA 94596
E-mail: sanjiv@linx.us

*If to MMDC:*

Eugene Rome, Esq.
Rome & Associates, APC
2029 Century Park East, Suite 450
Los Angeles, CA 90067
E-mail: erome@romeandassociates.com

Any party may change the address specified above by written notice to the other parties. Notices shall be deemed received when actually delivered to the addressee, or if earlier, three days after depositing in the United States mail, registered or certified, return receipt requested, addressed in accordance with this Paragraph.

9.    **Waiver.** By exercising or failing to exercise any of its rights, options or elections hereunder, Secured Party shall not be deemed to have waived any breach or default on the part of Debtor or to have released Debtor from any of its obligations hereunder, unless such waiver or release is in writing and signed by Secured Party. In addition, the waiver by Secured Party of any breach hereof or default in payment of any amounts due under the Note or this Security Agreement shall not be deemed to constitute a waiver of any succeeding breach or default.

10.    **Governing Law; Interpretation.** This Security Agreement shall be governed by the laws of the State of Nevada without reference to the conflicts of law principles of that State. The headings of sections and paragraphs in this Security Agreement are for convenience only and shall not be construed in any way to limit or define the content, scope, or intent of the provisions hereof. As used in this Security Agreement, the singular shall include the plural, and masculine, feminine, and neuter pronouns shall be fully interchangeable, where the context so requires. If any provision of this Security Agreement, or any paragraph, sentence, clause, phrase, or word, or the application thereof, in any circumstances, is adjudicated by a court of competent jurisdiction to be invalid, the validity of the remainder of this Security Agreement shall be construed as if such invalid part were never included herein. Time is of the essence of this Security Agreement. The security interest created hereby is intended to attach when this Security Agreement is executed by the Debtor and delivered to the Secured Party.

**IN WITNESS WHEREOF,** the parties hereto have caused this Security Agreement to be executed by their respective officers thereunto duly authorized as of the day and year first above written.

Linx Card, Inc.

By: _____
Name: Patrick Hammond
Its: Chief Executive Officer

## EXHIBIT A

## DESCRIPTION OF COLLATERAL

All of the Debtor's property now or at any time hereafter owned by Debtor or in which the Debtor may now or at any time hereafter have any interest or rights, and wherever located, including, without limitation, all of Debtor's right, title and interest in the following types and items of property:

All "accounts," "general intangibles," "chattel paper," "documents," "instruments," "deposit accounts," "inventory," "farm products," "fixtures" and "equipment," as such terms are defined in the Nevada Uniform Commercial Code in effect on the date hereof, and all life and other insurance policies and claims, and all rights in all litigation presently or hereafter pending for any cause or claim (whether in contract, tort or otherwise), and all judgments now or hereafter arising therefrom; the foregoing include, but are not limited to, the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located: all accounts receivable; plans and specifications; building materials; option rights; all obligations for the payment of money arising out of Debtor's sale or lease of goods or rendition of services; all moneys, securities and other property, now or hereafter held or received by, or in transit to, Secured Party from or for Debtor, whether for safekeeping, pledge, custody, transmission, collection or otherwise; all of Debtor's deposits (general or special), balances, sums and credits with, and all claims of Debtor against Secured Party, at any time existing; all right, title and interest of Debtor, and all of Debtor's rights, remedies, security and liens, in, to and in respect of all accounts and other collateral, including, without limitation, rights of stoppage in transit, replevin, repossession and reclamation and other rights and remedies of an unpaid vendor, lienholder or Secured Party, and all guaranties and other contracts of suretyship with respect to any accounts and other collateral, and all deposits and other security for any accounts and other collateral, and all credit and other insurance; all other general intangibles of every kind and description, including (without limitation) trade names and trademarks and the goodwill of the business symbolized thereby, federal, state and local tax refunds and claims of all kinds, all rights as a licensor or licensor or any kind, all customer lists, trade secrets, telephone numbers, processes, proprietary information, and purchase orders, and all rights to purchase, lease, sell, or otherwise acquire or deal with real or personal property (and all rights relating thereto); all notes, drafts, letters of credit, contract rights, and things in action; all drawings, specifications, blueprints and catalogs; and all raw materials, work in process, materials used or consumed in Debtor's business, goods, finished goods, returned goods and all other goods and inventory of whatsoever kind or nature, any and all wrapping, packaging, advertising and shipping materials, and all documents relating thereto, and all labels and other devices, names and marks affixed or to be affixed thereto for purposes of selling or identifying the same or the seller or manufacturer thereof; and all equipment, machinery, machine tools, motors, controls, parts vehicles, tools, dies, jigs, furniture, furnishings and fixtures; and all attachments, accessories, accessions and property now or hereafter affixed to or used in connection with any of the foregoing, and all substitutions and replacements for any of the foregoing; and all books, records, ledger cards, computer data and programs and other property and general intangibles at any time evidencing or relating to any or all of the foregoing; and all products and proceeds of any or all of the foregoing, in any form and wherever located (including, without limitation, any insurance proceeds, and all claims by Debtor against third Parties for loss or damage to, or destruction of, or otherwise relating to, any or all of the foregoing).

In addition to the foregoing, Debtor grants Secured Party a security interest to $920,506.82 plus interest presently maintained by First Data Merchant Services LLC, First Data Merchant Corporation, any other First Data entity and any acquirer associated with First Data (collectively, in the conjunctive or disjunctive, "First Data"). This grant of a security interest to the subject $920,506.82 plus interest authorizes Secured Party to (1) immediately inform First Data of the existence of the subject security interest; (2) advise that the subject interest prevents First Data from dispersing these funds to anyone other than Secured Party; and (3) to seek the subject secured funds directly from First Data in the event of breach of the underlying Agreement.



EXHIBIT D

Electronically Filed
8/30/2019 10:07 AM
Steven D. Grierson
CLERK OF THE COURT

1  **ORDR**
MARTIN J. KRAVITZ, ESQ.
2  Nevada Bar No. 83
ADAM J. WAX, ESQ.
3  Nevada Bar No. 12126
KRAVITZ, SCHNITZER & JOHNSON, CHTD.
4  8985 So. Eastern Avenue, Suite 200
Las Vegas, Nevada 89123
5  mkravitz@ksjattorneys.com
awax@ksjattorneys.com
6  Telephone:  (702) 362-6666
Facsimile:  (702) 362-2203
7

8  **ROME & ASSOCIATES, A.P.C.**
Eugene Rome (Cal. State Bar No.: 232780, *pro hac vice pending*)
9  crome@romeandassociates.com
2029 Century Park East, Suite 450
10  Los Angeles, CA 90067
Telephone: 310-282-0690
11  Facsimile: 310-282-0691

12

13  *Attorneys for Plaintiff, MM Development
Company, Inc., d/b/a Planet 13*

14

15                    **DISTRICT COURT**
                 **CLARK COUNTY, NEVADA**

16  MM DEVELOPMENT COMPANY, INC.          Case No.:  A-19-800347-C
   d/b/a PLANET 13, a Nevada Corporation,
17
                        Plaintiff,        Dept. No.: XXVII
18  vs.

19  LINX CARD, INC., a Delaware Corporation,

20                      Defendants.

21

22  <u>**ORDER GRANTING PLAINTIFF'S EX-PARTE MOTION TO LIFT N.R.C.P. 62**
**AUTOMATIC STAY AND FOR ORDER ALLOWING IMMEDIATE ENFORCEMENT**</u>
23       <u>**OF JUDGMENT ON ORDER SHORTENING TIME**</u>

24       This matter having come on for hearing on August 28, 2019, at 9:00 a.m. upon Plaintiff's

25  Ex-Parte Motion to Lift N.R.C.P. 62 Automatic Stay and for Order Allowing Immediate

26  Enforcement of Judgment on Order Shortening Time (the "Motion to Lift Stay"), Adam J. Wax,

27  Esq. appearing on behalf of Plaintiff MM DEVELOPMENT COMPANY, INC. d/b/a PLANET

28  13 ("MMDC"), and no appearance or Opposition filed on behalf of Defendant, Linx Card, Inc.,

the Court having considered the papers and pleadings filed by all parties and arguments of

KRAVITZ, SCHNITZER & JOHNSON, CHTD.
Attorneys
8985 S. Eastern Ave., Suite 200
Las Vegas, Nevada 89123

counsel, and good cause appearing therefore, the Court hereby FINDS AND ORDERS as follows:

## PROCEDURAL HISTORY

1.    On August 16, 2019, a Confession of Judgment in this matter was filed regarding a debt owed by Defendant, LINX CARD, INC., to Plaintiff MMDC (the "COJ").

2.    The COJ was Noticed into Entry on August 16, 2019.

3.    MMDC filed its Motion to Lift Stay on an Order Shortening Time on August 21, 2019.

4.    A Hearing on the Motion to Lift Stay was then set for August 28, 2019, at 9:00 a.m.

5.    On August 21, 2019, at 12:45 p.m., MMDC served Defendant Linx with the Motion to Lift Stay and the COJ, providing Linx notice of the August 28, 2019, hearing on the Motion to Lift Stay.

6.    On August 23, 2019, MMDC filed Proof of Service regarding MMDC's effectuating service upon Defendant Linx.

7.    Defendant Linx did not file an Opposition to the Motion to Lift Stay.

8.    On August 28, 2019, this Honorable Court heard oral argument on the Motion to Lift Stay.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

9.    The **COURT FINDS** that the COJ was filed on August 16, 2019, and Noticed into Entry on August 16, 2019.

10.    The **COURT FURTHER FINDS** that MMDC served Defendant Linx with the Motion to Lift Stay and the COJ, providing Linx notice of the August 28, 2019, hearing on the Motion to Lift Stay.

KRAVITZ, SCHNITZER & JOHNSON, CHTD.
Attorneys
8985 S. Eastern Ave., Suite 200
Las Vegas, Nevada 89123

11.    The **COURT FURTHER FINDS** that Defendant Linx did not file an Opposition to the Motion to Lift Stay.

12.    The **COURT FURTHER FINDS** that GOOD CAUSE EXISTS for the granting of the Motion to Lift Stay.

13.    The **COURT FURTHER FINDS** that GOOD CAUSE EXISTS to allow for MMDC to immediately execute upon the COJ following entry of the Order Granting the Motion to Lift Stay (i.e., the instant Order).

14.    The **COURT FURTHER FINDS** that that GOOD CAUSE EXISTS for the NRCP 62 stay to be lifted effective upon entry of the Order Granting the Motion to Lift Stay (i.e., the instant Order).

### ORDER

**BASED UPON THE ABOVE AND FOREGOING, IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that:

1. Plaintiff MM DEVELOPMENT COMPANY, INC. d/b/a PLANET 13's Motion to Lift N.R.C.P. 62 Automatic Stay and for Order Allowing Immediate Enforcement of Judgment on Order Shortening Time is **GRANTED** in its entirety.

2. The automatic stay currently in effect pursuant to NRCP 62 **shall be LIFTED upon entry of this Order.**

3. Upon entry of this Order, MMDC shall be allowed to immediately pursue enforcement of the Confession of Judgment of July 12, 2019, against Defendant, LINX CARD, INC.

4. Additionally upon entry of this Order, MMDC shall be allowed to immediately pursue enforcement of the Confession of Judgment of July 12, 2019, against third parties, including but not limited to, First Data Merchant Services, LLC, First Data

KRAVITZ, SCHNITZER & JOHNSON, CHTD.
Attorneys
8985 S. Eastern Ave., Suite 200
Las Vegas, Nevada 89123

Merchant Corporation, and/or any other First Data entity (collectively, "First Data"), and any acquirer, processor or other entity or person who may be possessed of MMDC's funds subject of the Confession of Judgment.

5. MMDC shall be allowed to collect the subject Debt of **$939,010.38**, plus applicable interest at the rate of ten percent (10%) per annum from August 15, 2019, through the present in the amount of **$3,344.42**, plus attorneys' fees and costs associated with enforcing the COJ in the amount of **$7,205.00**, for a total Judgment of **$949,559.80** from Linx and/or First Data.

6. Upon entry of this Order, First Data shall be required to immediately provide MMDC with the Collateral[1] from Linx currently in First Data's possession until such time as the total Judgment of **$949,559.80**, is satisfied in its entirety.

**IT IS SO ORDERED,**

DATED this 2 8 day of Aug , 2019.

_____
DISTRICT COURT JUDGE

Respectfully Submitted by:

MARTIN J. KRAVITZ, ESQ.
ADAM J. WAX, ESQ.
KRAVITZ, SCHNITZER & JOHNSON, CHTD.
mkravitz@ksjattorneys.com
awax@ksjattorneys.com
Telephone:  (702) 362-6666
Facsimile:  (702) 362-2203
*Attorneys for Plaintiff, MM Development
Company, Inc., d/b/a Planet 13*

7. Immediate Notice of Entry must be provided to Defendant and the law firm of Kolesar + Leatham-

---

[1] The "Collateral" is described specifically on page 8 of the July 12, 2019, Security Agreement between Linx and MMDC, also referred to as "Exhibit A" to that Security Agreement.

KRAVITZ, SCHNITZER & JOHNSON, CHTD.
Attorneys
8985 S. Eastern Ave., Suite 200
Las Vegas, Nevada 89123

# EXHIBIT E

Electronically Filed
8/30/2019 11:00 AM
Steven D. Grierson
CLERK OF THE COURT

**NEO**
MARTIN J. KRAVITZ, ESQ.
Nevada Bar No. 83
ADAM J. WAX, ESQ.
Nevada Bar No. 12126
KRAVITZ, SCHNITZER & JOHNSON, CHTD.
8985 So. Eastern Avenue, Suite 200
Las Vegas, Nevada  89123
mkravitz@ksjattorneys.com
awax@ksjattorneys.com
Telephone:  (702) 362-6666
Facsimile:  (702) 362-2203

**ROME & ASSOCIATES, A.P.C.**
Eugene Rome (Cal. State Bar No.: 232780, *pro hac vice pending*)
erome@romeandassociates.com
2029 Century Park East, Suite 450
Los Angeles, CA 90067
Telephone: 310-282-0690
Facsimile: 310-282-0691
*Attorneys for Plaintiff, MM Development*
*Company, Inc., d/b/a Planet 13*

**DISTRICT COURT**

**CLARK COUNTY, NEVADA**

| | |
|---|---|
| MM DEVELOPMENT COMPANY, INC. d/b/a PLANET 13, a Nevada Corporation, | Case No.:  A-19-800347-C |
| Plaintiff, | Dept. No.:  XXVII |
| vs. | |
| LINX CARD, INC., a Delaware Corporation, | |
| Defendants. | |

**NOTICE OF ENTRY OF ORDER**

//

//

//

//

//

//

KRAVITZ, SCHNITZER & JOHNSON, CHTD.
Attorneys
8985 S. Eastern Ave., Suite 200
Las Vegas, Nevada 89123

PLEASE TAKE NOTICE that on the 28th day of August, 2019, an Order Granting Plaintiff's Ex-Parte Motion to Lift N.R.C.P. 62 Automatic Stay and for Order Allowing Immediate Enforcement of Judgment on Order Shortening Time was entered in the above-entitled action, a copy of which is attached hereto.

DATED this _30_ day of August, 2019.

MARTIN L. KRAVITZ, ESQ.
Nevada Bar No. 83
ADAM J. WAX, ESQ.
Nevada Bar No. 12126
KRAVITZ, SCHNITZER & JOHNSON, CHTD.
8985 So. Eastern Avenue, Suite 200
Las Vegas, Nevada 89123
Telephone: (702) 362-6666
Facsimile: (702) 362-2203
*Attorneys for Plaintiff, MM Development Company, Inc., d/b/a Planet 13*

KRAVITZ, SCHNITZER & JOHNSON, CHTD.
Attorneys
8985 S. Eastern Ave., Suite 200
Las Vegas, Nevada 89123

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on the 30 day of August, 2019, I served a true and correct copy of the foregoing **NOTICE OF ENTRY OF ORDER** by submitting to the above-entitled Court for electronic filing and service upon the Court's Service List for the above-referenced case, and by depositing a copy in the United States Mail in an addressed sealed envelope, postage prepaid to the following :

Sanjiv Dhawan, Esq.
Linx Card, Inc.
2121 N. California Blvd. Suite 274
Walnut Creek, CA  94596
sanjiv@linx.us


KOLESAR & LEATHAM, ATTORNEYS AT LAW
400 S. Rampart Blvd. #400
Las Vegas, NV 89145
Tele: (702) 362-7800

An Employee of KRAVITZ, SCHNITZER
& JOHNSON, CHTD.

KRAVITZ, SCHNITZER & JOHNSON, CHTD.
Attorneys
8985 S. Eastern Ave., Suite 200
Las Vegas, Nevada 89123

Page 3 of 3

Electronically Filed
8/30/2019 10:07 AM
Steven D. Grierson
CLERK OF THE COURT

1  ORDR
   MARTIN J. KRAVITZ, ESQ.
2  Nevada Bar No. 83
   ADAM J. WAX, ESQ.
3  Nevada Bar No. 12126
   KRAVITZ, SCHNITZER & JOHNSON, CHTD.
4  8985 So. Eastern Avenue, Suite 200
   Las Vegas, Nevada 89123
5  mkravitz@ksjattorneys.com
   awax@ksjattorneys.com
6  Telephone: (702) 362-6666
   Facsimile: (702) 362-2203
7
8  ROME & ASSOCIATES, A.P.C.
9  Eugene Rome (Cal. State Bar No.: 232780, *pro hac vice pending*)
   erome@romeandassociates.com
10 2029 Century Park East, Suite 450
   Los Angeles, CA 90067
11 Telephone: 310-282-0690
   Facsimile: 310-282-0691
12
13 *Attorneys for Plaintiff, MM Development*
   *Company, Inc., d/b/a Planet 13*
14

15            DISTRICT COURT
         CLARK COUNTY, NEVADA
16
   MM DEVELOPMENT COMPANY, INC.        Case No.: A-19-800347-C
   d/b/a PLANET 13, a Nevada Corporation,
17
                    Plaintiff,          Dept. No.: XXVII
18
   vs.
19
   LINX CARD, INC., a Delaware Corporation,
20
                    Defendants.
21

22 <u>ORDER GRANTING PLAINTIFF'S EX-PARTE MOTION TO LIFT N.R.C.P. 62
   AUTOMATIC STAY AND FOR ORDER ALLOWING IMMEDIATE ENFORCEMENT
23           OF JUDGMENT ON ORDER SHORTENING TIME</u>

24        This matter having come on for hearing on August 28, 2019, at 9:00 a.m. upon Plaintiff's

25 Ex-Parte Motion to Lift N.R.C.P. 62 Automatic Stay and for Order Allowing Immediate

26 Enforcement of Judgment on Order Shortening Time (the "Motion to Lift Stay"), Adam J. Wax,

27 Esq. appearing on behalf of Plaintiff MM DEVELOPMENT COMPANY, INC. d/b/a PLANET

28 13 ("MMDC"), and no appearance or Opposition filed on behalf of Defendant, Linx Card, Inc.,

   the Court having considered the papers and pleadings filed by all parties and arguments of

*(left margin, vertical)* KRAVITZ, SCHNITZER & JOHNSON, CHTD. Attorneys 8985 S. Eastern Ave., Suite 200 Las Vegas, Nevada 89123

counsel, and good cause appearing therefore, the Court hereby FINDS AND ORDERS as follows:

<u>PROCEDURAL HISTORY</u>

1.      On August 16, 2019, a Confession of Judgment in this matter was filed regarding a debt owed by Defendant, LINX CARD, INC., to Plaintiff MMDC (the "COJ").

2.      The COJ was Noticed into Entry on August 16, 2019.

3.      MMDC filed its Motion to Lift Stay on an Order Shortening Time on August 21, 2019.

4.      A Hearing on the Motion to Lift Stay was then set for August 28, 2019, at 9:00 a.m.

5.      On August 21, 2019, at 12:45 p.m., MMDC served Defendant Linx with the Motion to Lift Stay and the COJ, providing Linx notice of the August 28, 2019, hearing on the Motion to Lift Stay.

6.      On August 23, 2019, MMDC filed Proof of Service regarding MMDC's effectuating service upon Defendant Linx.

7.      Defendant Linx did not file an Opposition to the Motion to Lift Stay.

8.      On August 28, 2019, this Honorable Court heard oral argument on the Motion to Lift Stay.

<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

9.      The **COURT FINDS** that the COJ was filed on August 16, 2019, and Noticed into Entry on August 16, 2019.

10.     The **COURT FURTHER FINDS** that MMDC served Defendant Linx with the Motion to Lift Stay and the COJ, providing Linx notice of the August 28, 2019, hearing on the Motion to Lift Stay.

Page 2 of 4

KRAVITZ, SCHNITZER & JOHNSON, CHTD.
Attorneys
8985 S. Eastern Ave., Suite 200
Las Vegas, Nevada 89123

11.     The **COURT FURTHER FINDS** that Defendant Linx did not file an Opposition to the Motion to Lift Stay.

12.     The **COURT FURTHER FINDS** that GOOD CAUSE EXISTS for the granting of the Motion to Lift Stay.

13.     The **COURT FURTHER FINDS** that GOOD CAUSE EXISTS to allow for MMDC to immediately execute upon the COJ following entry of the Order Granting the Motion to Lift Stay (i.e., the instant Order).

14.     The **COURT FURTHER FINDS** that that GOOD CAUSE EXISTS for the NRCP 62 stay to be lifted effective upon entry of the Order Granting the Motion to Lift Stay (i.e., the instant Order).

<u>ORDER</u>

BASED UPON THE ABOVE AND FOREGOING, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

1.  Plaintiff MM DEVELOPMENT COMPANY, INC. d/b/a PLANET 13's Motion to Lift N.R.C.P. 62 Automatic Stay and for Order Allowing Immediate Enforcement of Judgment on Order Shortening Time is GRANTED in its entirety.

2.  The automatic stay currently in effect pursuant to NRCP 62 shall be LIFTED **upon entry of this Order.**

3.  Upon entry of this Order, MMDC shall be allowed to immediately pursue enforcement of the Confession of Judgment of July 12, 2019, against Defendant, LINX CARD, INC.

4.  Additionally upon entry of this Order, MMDC shall be allowed to immediately pursue enforcement of the Confession of Judgment of July 12, 2019, against third parties, including but not limited to, First Data Merchant Services, LLC, First Data

**KRAVITZ, SCHNITZER & JOHNSON, CHTD.**
Attorneys
8985 S. Eastern Ave., Suite 200
Las Vegas, Nevada 89123

Merchant Corporation, and/or any other First Data entity (collectively, "First Data"), and any acquirer, processor or other entity or person who may be possessed of MMDC's funds subject of the Confession of Judgment.

5. MMDC shall be allowed to collect the subject Debt of **$939,010.38**, plus applicable interest at the rate of ten percent (10%) per annum from August 15, 2019, through the present in the amount of **$3,344.42**, plus attorneys' fees and costs associated with enforcing the COJ in the amount of **$7,205.00**, for a total Judgment of **$949,559.80** from Linx and/or First Data.

6. Upon entry of this Order, First Data shall be required to immediately provide MMDC with the Collateral[1] from Linx currently in First Data's possession until such time as the total Judgment of **$949,559.80**, is satisfied in its entirety.

**IT IS SO ORDERED.**

DATED this _28_ day of _Aug_____, 2019.

_Nancy I. M F_
DISTRICT COURT JUDGE

Respectfully Submitted by:

MARTIN J. ~~KRAVITZ, ESQ.~~
ADAM J. WAX, ESQ.
KRAVITZ, SCHNITZER & JOHNSON, CHTD.
mkravitz@ksjattorneys.com
awax@ksjattorneys.com
Telephone: (702) 362-6666
Facsimile: (702) 362-2203
*Attorneys for Plaintiff, MM Development
Company, Inc., d/b/a Planet 13*

7. Immediate Notice of Entry must be provided to Defendant and the law firm of Kolesar & Leatham.

---

[1] The "Collateral" is described specifically on page 8 of the July 12, 2019, Security Agreement between Linx and MMDC, also referred to as "Exhibit A" to that Security Agreement.

Page 4 of 4

KRAVITZ, SCHNITZER & JOHNSON, CHTD.
Attorneys
8985 S. Eastern Ave., Suite 200
Las Vegas, Nevada 89123

EXHIBIT F

## Eugene Rome

| | |
|---|---|
| **From:** | Matt Knoop <MKnoop@Polsinelli.com> |
| **Sent:** | Thursday, September 05, 2019 12:51 PM |
| **To:** | Eugene Rome |
| **Cc:** | John Peterson |
| **Subject:** | MM Development Co. v. Linx Card, Inc. |
| **Attachments:** | 2019.08.30 Notice of Entry of Order-c.pdf; 2019.08.30 Order Granting Plf Ex-Parte Motion-c.pdf |

Eugene,

First Data has asked that we respond to your August 30, 2019 email correspondence to Chris Demetriades at First Data enclosing the attached "Notice of Entry of Order" and "Order Granting Plaintiff's Ex Parte Motion to Lift N.R.C.P. 62 Automatic Stay and for Order Allowing Immediate Enforcement of Judgment on Order Shortening Time" ("Order") in *MM Development Co. v. Linx Card, Inc.*, Case No. A-19-800347-C, District Court of Clark County, Nevada. Notably, no First Data entity is a party to the foregoing lawsuit nor is any First Data entity a party to the July 12, 2019 Security Agreement between Linx Card, Inc. ("Linx Card") and MM Development Company, Inc. d/b/a Planet 13 ("Planet 13") referenced in the Order.

Your August 30, 2019 email correspondence to First Data references the Order and requests that First Data "transfer over the sum of $949,559.80 of funds held for Linx Card, Inc. to MM Development Company, Inc. dba Planet 13." First Data, however, has no active merchant account in the name of Linx Card, Inc. in which it is holding funds. Moreover, First Data has never had a merchant account in the legal name of Linx Card, Inc. Accordingly, there are no funds to transfer to your client.

If you have additional information you would like to provide in support of your request, please do not hesitate to contact me. I understand that John already has a message into you, so we can discuss during your call if you'd like.

Matt

**Matthew S. Knoop**
*Shareholder*

mknoop@polsinelli.com
**404.253.6023**
1201 West Peachtree Street, Suite 1100
Atlanta, GA 30309
polsinelli.com

*"Powerhouse" in Complex Commercial Litigation -
top 1% of law firms nationwide*
*"Client Service A Team" - top 5% of law firms nationwide*

**POLSINELLI**
Polsinelli PC, Polsinelli LLP in California

This electronic mail message contains CONFIDENTIAL information which is (a) ATTORNEY - CLIENT PRIVILEGED COMMUNICATION, WORK PRODUCT, PROPRIETARY IN NATURE, OR OTHERWISE PROTECTED BY LAW FROM

DISCLOSURE, and (b) intended only for the use of the Addressee(s) named herein. If you are not an Addressee, or the person responsible for delivering this to an Addressee, you are hereby notified that reading, copying, or distributing this message is prohibited. If you have received this electronic mail message in error, please reply to the sender and take the steps necessary to delete the message completely from your computer system.

EXHIBIT G

<u>Personal Guaranty</u>

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and as an inducement to First Data Merchant Services Corporation, Wells Fargo Bank, NA (a member of Visa, USA, Inc. and MasterCard International, Inc., bank) and TeleCheck Services, Inc. (First Data Merchant Services Corporation and Bank are collectively referred to as the "Servicers") to enter into the Agreement (as such term is hereinafter defined), the undersigned, Richard J. Scherer (the "Guarantor"), unconditionally guarantees to the Servicers the full and prompt payment of each and every present and future liability, debt and obligation (the "Guaranteed Obligations") of Pelican Communications, Inc. ("Client"), under the Merchant Processing Application and Agreement dated on or around December 10th, 2008, between the Servicers and Client (as at any time amended, supplemented, renewed or modified, the "Agreement").

The Guarantor hereby waives: notice of acceptance of this Guaranty; notice of the creation of any Guaranteed Obligation to which it may apply, and waives presentment, demand of payment, protest, notice of dishonor or nonpayment of any such liability, suit or taking of other action by the Servicers; notice of any adverse change in Client's financial condition or of any other fact which might increase Guarantor's risk; and any right Guarantor may have, by statute or otherwise, to require the Servicers to institute suit against Client after notice or demand from Guarantor or to seek recourse first against Client or otherwise, or to realize upon any security for the Guaranteed Obligations, as a condition to enforcing Guarantor's liability and obligations hereunder.

The Servicers may at any time and from time to time, without the consent of, or notice to, the Guarantor, without incurring responsibility to the Guarantor, without impairing or releasing the obligations of Guarantor hereunder: (i) change the manner, place or terms of the payment of, and/or change or extend the time of payment of, renew, alter or increase the amount of any of the Guaranteed Obligations or any interest payable thereon, and the guaranty herein made shall apply to the Guaranteed Obligations as so changed, extended, renewed or altered; (ii) exercise or refrain from exercising any rights against Client or others or otherwise act or refrain from acting; (iii) consent to or waive any breach of, or any act, omission or default under, the Agreement, or otherwise amend, modify, renew or supplement the Agreement; and (iv) release, impair or waive the benefits of any security for any of the Guaranteed Obligations or any other party liable thereon.

The obligations of Guarantor under this Guaranty are absolute and unconditional and shall remain in full force and effect without regard to, and shall not be released, suspended, discharged, terminated or otherwise affected by, any circumstance or occurrence whatsoever, including without limitation: (i) any action or inaction by the Servicers as contemplated in the preceding paragraph; or (ii) any invalidity, irregularity or unenforceability of all or any part of the Guaranteed Obligations. This Guaranty is a primary obligation of the Guarantor. The Servicers shall not have any obligation whatsoever to seek payment from Client under this Guaranty. This Guaranty shall be in addition to any other present or future guaranty or other security for the payment, performance and satisfaction of the Guaranteed Obligations, shall not be prejudiced or

First Data-0000517

Guarantor consents and agrees, that the Servicers shall be under no obligation to marshal any assets in favor of Guarantor or in payment of any or all of the Guaranteed Obligations. Guarantor further agrees that, if and to the extent the Servicers receives any payment on account of any of the Guaranteed Obligations (whether from Client, Guarantor or a third party obligor or from the sale or other disposition of any collateral) and such payment or any party thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other part under any bankruptcy act, state or federal law, common law or equitable cause, then the part of the Guaranteed Obligations intended to be satisfied shall be revived and continued in full force and effect as if said payment had not been made. The foregoing provisions of this paragraph shall survive the termination or revocation of this Guaranty.

This Guaranty is a continuing one and all liabilities to which it applies or may apply under the terms hereof shall be conclusively presumed to have been created in reliance thereon. No failure or delay on the part of the Servicers in exercising any right, power or privilege hereunder and no course of dealing between the Guarantor, the Servicers or Client shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights, powers and remedies herein expressly provided are cumulative and not exclusive of any rights, powers or remedies which the Servicers would otherwise have. No notice to or demand on the Guarantor in any case shall entitle the Guarantor to any other further notice or demand in a similar or other circumstances or constitute a waiver of the rights of the Servicers to any other or further action in any circumstances without notice or demand.

This Guaranty may not be terminated by Guarantor and shall terminate upon the full payment and satisfaction of all of the Guaranteed Obligations.

This Guaranty shall be binding upon the Guarantor and its successors and assigns and inure to the benefit of the Servicers and its successors and assigns.

This Guaranty constitutes the entire agreement between the parties hereto with respect to the matters specifically addressed herein and supersedes any prior guaranty between the parties regarding such matters. This Guaranty shall not be modified or altered except by a written instrument executed by Guarantor and the Servicers.

This Guaranty shall be governed by the laws of the state of Florida (exclusive or the choice of law rules thereof). Guarantor hereby consents to the jurisdiction of the state and federal courts in the state of Florida in any dispute arising from or in connection with this Guaranty. Guarantor further agrees that service of process may be made, in addition to any other method permitted by law, by certified mail, return receipt requested.

THE GUARANTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS GUARANTY AND THE AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF GUARANTOR, THE CLIENT, THE BANK OR THE SERVICERS. THIS PROVISION IS A MATERIAL INDUCEMENT TO THE SERVICERS TO ENTER IN THE AGREEMENT.

In the event that Guarantor shall have any right under applicable law to terminate or revoke this Guaranty, which right cannot be waived by Guarantor, Guarantor agrees that such termination or revocation shall not be effective until a written notice of such termination or revocation, specifically referring to this Guaranty and signed by Guarantor, is actually received by an officer of the Servicers who is familiar with Client's account with the Servicers and this Guaranty; but any such termination or revocation shall not affect the right and power of the Servicers to enforce rights arising, incurred or contracted for prior to the Servicers' receipt of such written notice of termination or revocation.

UNTIL EACH OF THE GUARANTEED OBLIGATIONS HAS BEEN PAID AND SATISFIED IN FULL, GUARANTOR SHALL HAVE NO CLAIM, RIGHT OR REMEDY (WHETHER OR NOT ARISING IN EQUITY, BY CONTRACT OR APPLICABLE LAW) AGAINST CLIENT OR ANY OTHER PERSON BY REASON OF GUARANTOR'S PAYMENT OR OTHER PERFORMANCE HEREUNDER. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, GUARANTOR HEREBY WAIVES AND RENOUNCES ANY AND ALL LEGAL OR EQUITABLE RIGHTS OR CLAIMS THAT GUARANTOR MAY HAVE TO REIMBURSEMENT, SUBROGATION, INDEMNITY AND EXONERATION AND AGREES THAT GUARANTOR SHALL HAVE NO RECOURSE TO ANY ASSETS OR PROPERTY OF CLIENT (INCLUDING ANY ASSETS SECURING ANY OF THE GUARANTEED OBLIGATIONS) AND NO RIGHT OF RECOURSE AGAINST OR CONTRIBUTION FROM ANY OTHER PERSON IN ANY WAY DIRECTLY OR CONTINGENTLY LIABLE FOR ANY OF THE INDEBTEDNESS, WHETHER ANY OF SUCH RIGHTS ARISE UNDER CONTRACT, IN EQUITY OR UNDER APPLICABLE LAW.

If any provision of this Guaranty shall be held to be invalid or unenforceable in whole or in part, then the invalidity or unenforceability of such provision shall not by held to invalidate any other provision contained herein and all such other provisions shall remain in full force and effect.

Guarantor agrees to pay all expenses incurred by the Servicers in connection with enforcement of the Servicers' rights under this Guaranty, including, but not limited to, court costs, collection charges and reasonable attorneys' fees and disbursements.

Date: _____ 5 . 1 . 1 9 _____

Witness:

_____

Print Name:_____
Address:_____

_____

_____

Guarantor:

By:___Richard J. Scherer_____
Title:_____Pres_____
SSN: [ Redacted ]

STATE OF _____   )
COUNTY OF_____   )

On this ____ day of _____, 20__, before me personally came
_____, known to me to be the individual described in and who executed the foregoing
Certificate, and (s)he duly acknowledged to me that (s)he executed the same.

Notary Public

_____
Sign

_____
Print

State of _____ at Large (Seal)
My commission expires:

ONFIDENTIAL

EXHIBIT H

## ASSIGNMENT OF PROCEEDS
### (Merchant Reserve Account)

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, **Pelican Communications Inc.**, a California corporation, whose principal place of business is 77 Front Street, Danville, California 94526 and **Givv, Inc.**, a California corporation ("ASSIGNORS"), irrevocably assign to **MM Development Company, Inc.**, a Nevada corporation doing business as **Planet 13**, whose principal place of business is 205 North Stephanie Street, Suite D-126, Henderson, Nevada 89074 ("ASSIGNEE"), all its interest in the proceeds, distribution, release, recovery and right to receive all funds held in connection with its processing activity at First Data Merchant Services LLC ("PROCESSOR") through merchant account identified as appears at Exhibit A [Reserve and Collection Statement] and Exhibit B, (the "Account"), whether such funds are held in divert, suspense or as reserves, together with all sums deposited into the Account and/or any holding/suspense/reserve account associated with the Account, as of the date below executed, and all sums which may be deposited thereafter up to the amount of Nine Hundred Eighty-Nine Thousand, Ten Dollars and Thirty-Eight Cents ($989,010.38) (collectively "Account Funds").

1.    *Direction to Processor.* ASSIGNORS hereby demand and direct PROCESSOR to release all Account Funds, or any portion of Account Funds, to ASSIGNEE, without need for further authorization from ASSIGNORS.

2.    *Receipts.* If ASSIGNORS receive any remittance in payment of the Account, they shall immediately forward such remittance to ASSIGNEE in the form received, properly endorsed. ASSIGNORS shall act as a fiduciary to ASSIGNEE for any remittance in payment of any funds of the Account.

3.    *Power of attorney.* ASSIGNORS authorize ASSIGNEE to endorse the name of ASSIGNORS on any check, money order, or other evidence of remittance made on the Account. ASSIGNORS shall fully cooperate with ASSIGNEE in the execution and delivery of further or other documents as may be reasonably required by ASSIGNEE or its attorneys from time to time.

4.    *Representations.* ASSIGNORS are the sole absolute owners of the Account and have full legal right to sell, transfer, and assign it. ASSIGNORS warrant that the Account has not been sold, assigned, transferred, or pledged, and, aside from ASSIGNORS, no person, firm or corporation has any lien on, or claim to, such Account described therein, or any part thereof. Furthermore, ASSIGNORS hereby ratify and confirm any action of ASSIGNEE in the recovery of the funds of the Account.



ASSIGNMENT OF PROCEEDS                                      Page 1 of 1

5.      *Notification.* ASSIGNORS authorize ASSIGNEE to notify the PROCESSOR, on the ASSIGNORS' letterhead, of the assignment of the Account and the Account Funds and to advise the PROCESSOR to make all future payments to ASSIGNEE.

IN WITNESS WHEREOF, I have hereunto set my hand this _____ day of _____ _____.

[*Signature on following two pages*]

**ASSIGNMENT OF PROCEEDS**                                    Page 2 of 2

"ASSIGNOR"
Pelican Communications, Inc.

By: _____     Date: /0.22.19
Richard Scherer, CEO

Signed and acknowledged in the presence of:


Witness: _____          Witness: _____


STATE OF _____          :

                                    SS:
COUNTY OF _____          :

      Before me, a Notary Public, in and for said county, personally appeared the above
named        and        who acknowledges that he did sign the foregoing instrument and
that the same is his free act and deed.

IN WITNESS WHEREOF, I have hereunto set my hand this        day of        .

                                    _____
                                    Notary Public


ASSIGNMENT OF PROCEEDS                                    Page 3 of 3

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                    CIVIL CODE § 1189

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                              )

County of ___Monterey___                        )

On __October 22, 2019__ before me, ___Nunilo Pimentel, Notary Public,___

      *Date*                                    *Here Insert Name and Title of the Officer*

personally appeared _____Richard Scherer_____

                                        *Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

> NUNILO PIMENTEL
> Notary Public - California
> Monterey County
> Commission # 2188754
> My Comm. Expires Apr 26, 2021

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

               *Signature of Notary Public*

      *Place Notary Seal Above*

─────────── **OPTIONAL** ───────────

*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: _____
Document Date: _____ Number of Pages: _____
Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| | |
|---|---|
| Signer's Name: _____ | Signer's Name: _____ |
| ☐ Corporate Officer — Title(s): _____ | ☐ Corporate Officer — Title(s): _____ |
| ☐ Partner — ☐ Limited  ☐ General | ☐ Partner — ☐ Limited  ☐ General |
| ☐ Individual     ☐ Attorney in Fact | ☐ Individual     ☐ Attorney in Fact |
| ☐ Trustee     ☐ Guardian or Conservator | ☐ Trustee     ☐ Guardian or Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer Is Representing: _____ | Signer Is Representing: _____ |

©2016 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)   Item #5907

"ASSIGNOR"
Givv, Inc.

By: _____    Date: 21 OCT 2019
Patrick Hammond, CEO

Signed and acknowledged in the presence of:

Witness: _____    Witness: _____

STATE OF California          :

                    SS:

COUNTY OF Contra Costa        :

    Before me, a Notary Public, in and for said county, personally appeared the above named Patrick and Hammond and who acknowledges that he did sign the foregoing instrument and that the same is his free act and deed.

IN WITNESS WHEREOF, I have hereunto set my hand this 21st day of October, 2019

_____
Notary Public

See Attached: California Certificate of Acknowledgment

BRUCE A. LINN
COMM. #2150417
Notary Public   California
Contra Costa County
My Comm. Expires Apr. 26, 2020

ASSIGNMENT OF PROCEEDS                    Page 4 of 4

## CALIFORNIA CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of
the individual who signed the document to which this certificate is attached, and not
the truthfulness, accuracy, or validity of that document.

State of California                          )

County of _Contra Costa_                     )

On _10/21/2019_ before me, _Bruce A. Linn, Notary Public_
(here insert name and title of the officer)

personally appeared _Patrick Hammond_

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to
the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity
upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the
State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Bruce A. Linn_

(Seal)

BRUCE A. LINN
COMM. #2150417
Notary Public - California
Contra Costa County
My Comm. Expires Apr. 29, 2020

## Optional Information

Although the information in this section is not required by law, it could prevent fraudulent removal and reattachment of this acknowledgment to an
unauthorized document and may prove useful to persons relying on the attached document.

Description of Attached Document

The preceding Certificate of Acknowledgment is attached to a document

titled/for the purpose of _Assignment of Proceeds_

containing _4_ pages, and dated _10/21/2019_

The signer(s) capacity or authority is/are as:

☑ Individual(s)
☐ Attorney-in-Fact
☐ Corporate Officer(s) _____
                          Title(s)

☐ Guardian/Conservator
☐ Partner - Limited/General
☐ Trustee(s)
☐ Other: _____

representing: _____
          Name(s) of Person(s) or Entity(ies) Signer is Representing

Additional Information

Method of Signer Identification

Proved to me on the basis of satisfactory evidence:
☑ form(s) of identification  ○ credible witness(es)

Notarial event is detailed in notary journal on:
Book _115_ Page # Entry # _1_

Notary contact: _Bruce A. Linn_

Other
☐ Additional Signer(s)  ☐ Signer(s) Thumbprint(s)
☐

© Copyright 2007-2015 Notary Rotary, Inc. PO Box 41400, Des Moines, IA 50311-0507   All Rights Reserved.   Item Number 101772.   Please contact your Authorized Reseller to purchase copies of this form.

"ASSIGNEE"

**MM Development Company, Inc. d/b/a Planet 13**

By: _____   Date: _____
    Larry Scheffler, President

Signed and acknowledged in the presence of:

Witness: _____   Witness: _____

STATE OF _____          :

                          SS:
COUNTY OF _____              :

        Before me, a Notary Public, in and for said county, personally appeared the above named       and       who acknowledges that he did sign the foregoing instrument and that the same is his free act and deed.

IN WITNESS WHEREOF, I have hereunto set my hand this       day of       .

                                        _____
                                        Notary Public

**ASSIGNMENT OF PROCEEDS**                              Page 5 of 5

# EXHIBIT A

## Reserve and Collection Statement
### First Data Services

Page: 1                                                                    Run date: 10-JUN-19 08:56:09 AM

Merchant Number:         Redacted          Merchant Bill to Telephone:  9259383836

Merchant Bill to Name:   PELICAN COMMUNICATIONS I    Merchant Fax:

Merchant Bill to Address:  77 FRONT STREET

                           DANVILLE      CA      94526  0

Contact:  DEBBIE BARTMAN                              Reserve Balance:        $  698,975.92

                                                     Collection Balance:     $      0.00

| Tran Date | Description | Debit Amt | Credit Amt | Running Balance | Original Merchant Number |
|---|---|---|---|---|---|
| 03-MAY-19 | Diverted Batch | $ 0.00 | $ 101,033.60 | -$ 101,033.60 | |
| 03-MAY-19 | Diverted Batch | $ 0.00 | $ 100,861.76 | -$ 202,515.66 | |
| 03-MAY-19 | Diverted Batch | $ 0.00 | $ 103,654.60 | -$ 306,070.26 | |
| 03-MAY-19 | Diverted Batch | $ 0.00 | $ 101,932.42 | -$ 408,002.68 | |
| 27-MAY-19 | Batch Holdback - Revolving Payment Plan | $ 0.00 | $ 76,858.88 | -$ 484,861.68 | |
| 28-MAY-19 | Diverted Batch | $ 0.00 | $ 83,061.67 | -$ 567,923.33 | |
| 28-MAY-19 | Diverted Batch | $ 0.00 | $ 80,989.44 | -$ 648,912.77 | |
| 28-MAY-19 | Diverted Batch | $ 0.00 | $ 102,809.64 | -$ 761,722.41 | |
| 28-MAY-19 | Diverted Batch | $ 0.00 | $ 90,728.67 | -$ 890,461.08 | Redacted |
| 29-MAY-19 | Diverted Batch | $ 0.00 | $ 65,942.05 | -$ 916,384.13 | |
| 07-JUN-19 | Interchange Fee - Financial Entry Reject | $141,559.33 | $ 0.00 | -$ 774,795.80 | |
| 07-JUN-19 | Discount Fee - Financial Entry Reject | $ 28,535.01 | $ 0.00 | -$ 746,260.79 | |
| 07-JUN-19 | Misc Processing Fee - Financial Entry Reject | $ 52,024.26 | $ 0.00 | -$ 698,236.51 | |
| 07-JUN-19 | Chargeback Reversal | $ 0.00 | $ 106.68 | -$ 698,343.19 | |
| 07-JUN-19 | Chargeback Reversal | $ 0.00 | $ 228.33 | -$ 698,568.52 | |
| 07-JUN-19 | Chargeback Reversal | $ 0.00 | $ 247.51 | -$ 698,819.03 | |
| 07-JUN-19 | Chargeback Reversal | $ 0.00 | $ 2,169.89 | -$ 698,975.02 | |

CONFIDENTIAL

First Data-0000514

# EXHIBIT B

PO Box 8879
Coral Springs, FL 33075

## YOUR CARD PROCESSING STATEMENT

GIVV KIOSK GIFT CARDS
PATRICK HAMMOND
1990 N CALIFORNIA BLVD FL 8TH
WALNUT CREEK CA 94596-7261

390514
Acct  021

| | |
|---|---|
| Page 1 of 7 | *THIS IS NOT A BILL* |
| Statement Period | 03/01/19 - 03/31/19 |
| Merchant Number | Redacted |
| Customer Service | Website - www.businesstrack.com |
| | Phone - 1-877-273-0191 |

| | |
|---|---|
| Page 1 | Total Amount Submitted | $991,168.85 |
| Page 2 | Chargebacks/Reversals | -$3,027.45 |
| Page 3 | Adjustments | 0.00 |
| Page 4 | Fees | -$22,134.42 |
| **Total Amount Processed** | | **$966,006.78** |

## IMPORTANT INFORMATION ABOUT YOUR ACCOUNT

IMPORTANT NOTICE: Recently, the Card Organizations announced several operational changes. You can see a summary of these announced changes in the enclosed document, "Release Summary - April 2019." To access this document and other valuable information, you will need to register and/or log into www.businesstrack.com. To register, you will need your Merchant Identification Number and your business checking account number. If you have trouble finding the referenced document once logged into the site, please call the customer service number listed on your merchant statement to request a copy.

Important Information: Datawire Certificate Update

The CA/B (Certification Authority Browser) forum has mandated the removal of all Symantec/Verisign Root CA certificates. A Root CA certificate enables Datawire to verify that the merchant and their certificates are trustworthy. Datawire will begin migrating to the new DigiCert Root CA?s in 2019.
What does this mean to you? Review is underway to identify all Symantec/Verisign Root CA certificates. If we determine you do not have a Symantec/Verisign Root CA certificate, no further action is required. If we determine that you do have a Symantec/Verisign Root CA certificate, we will contact you with instructions to make the appropriate updates.
If you are already aware that you need to update your POS device with the new DigiCert Root certificate and would like to get a head start, simply go to the DigiCert website at http://www.digicert.com/digicert-root-certificates.htm to download and install the updated Root Certificate Authorities into your Root store of the POS devices. If you have any questions about this change, please contact Customer Service by calling the phone number listed on this statement and select the option for Technical Support.

| Date Submitted | Submitted Amount | Chargebacks/ Reversals | Adjustments | Fees | Amount Processed |
|---|---|---|---|---|---|
| 03/01/19 | $100,864.00 | -$603.54 | 0.00 | -$533.07 | $101,327.49 |
| 03/02/19 | $171,257.72 | 0.00 | 0.00 | -$6,485.11 | $194,772.81 |
| 03/03/19 | $140,760.68 | 0.00 | 0.00 | -$2,934.44 | $137,786.24 |
| 03/04/19 | $119,788.94 | -$1,673.50 | 0.00 | -$1,365.62 | $115,899.82 |

PO Box 8879
Coral Springs, FL 33075

4